## Case No. 17,976.

### The WOODLAND.

[7 Ben. 110.] [1]

District Court, S. D. New York. Jan., 1874. [2]

LIEN ON VESSEL—ADVANCES IN FOREIGN PORT—LIMITATION OF MASTER'S AUTHORITY—JURISDICTION OF ENGLISH ADMIRALTY.

1. The barque W., a British vessel, bound from Montevideo to New York, put into St. Thomas, a Danish port, in distress. The master applied to N. & Co., merchants there, to do the business of the vessel. The cargo was discharged, some of it was found to be damaged and was sold, and the rest was reshipped on the vessel, after she had been repaired. Her repairs took about two months. For the balance of the amount claimed by N. & Co. for services and expenses for the vessel and her cargo, after deducting the proceeds of cargo sold, N. & Co. received from the master drafts on his owners, each containing on its face the words, "place to account of disbursements of barque W. and cargo, at this port, and recoverable against the vessel, freight and cargo." The owners of the vessel had written to the master, from St. John, New Brunswick, a letter containing these words: "As soon as H. & P. heard of the dis-

[1] [Reported by Robert D. Benedict, Esq., and B. Lincoln Benedict, Esq., and here reprinted by permission.]

[2] [Affirmed in Case No. 17,977. Decree of circuit court affirmed by supreme court in 104 U. S. 180.]

aster, they wrote you to draw on them for funds to pay for your repairs, and sent letters to S. & Co. to show their standing. With these we doubt not you will be able to obtain your funds cheaply, and thereby avoid the great expense of a bottomry; or, if it could be done better, draw on us, either payable here or in New York, in gold." H. & P. were the agents in New York of the owners of the vessel. S. & Co. had refused to furnish the funds, and N. & Co. had agreed to raise them by bottomry and respondentia, before this letter arrived. On its arrival, the agreement for bottomry and respondentia was given up, and a conditional agreement to take the master's drafts on the owners of the vessel was made. N. & Co. then offered to sell the proposed drafts to F. & Co., showing them the above passage in the letter of the owners. F. & Co. thereupon declined to buy the drafts, unless the master would put in the clause making them recoverable against vessel, freight and cargo. This was done, and F. & Co. then bought the drafts of N. & Co., at 2½ per cent. discount, paying for them in cash. F. & Co., on the arrival of the vessel in New York, filed a libel against her to recover the amount of the drafts: *Held*, that the authority of the master to pledge the vessel to raise money for the repairs, was, by the letter of the owners, expressly limited to a pledge by way of bottomry; and that, as that letter was shown to F. & Co., they took the drafts with knowledge that the master was exceeding his powers in putting the hypothecation of the vessel into the drafts, and that F. & Co., therefore, had no lien on the vessel.

[Cited in The Columbus, Case No. 3,044; The Wexford, 7 Fed. 679; The William Cook, 12 Fed. 920; Stephenson v. The Francis. 21 Fed. 726; The Scotia, 35 Fed. 908; The Lykus, 36 Fed. 921; Liverpool & G. W. Steam Co. v. Phenix Ins. Co., 129 U. S. 450, 9 Sup. Ct. 475.]

[Cited in Mitchell v. Chambers, 43 Mich. 164, 5 N. W. 67.]

2. Whether the high court of admiralty in England would, under the 5th section of the act of May 17, 1861 (24 Vict. c. 10), take jurisdiction of a suit in rem against this British vessel to enforce a lien for necessaries furnished her in a Danish port, *quære*.

[This was a libel by J. H. Fechtenburg and J. A. Lovengreen, trading as J. H. Fechtenburg & Co., against the British barque Woodland.]

J. Ridgway, for libellants.
T. Scudder, for claimants.

BLATCHFORD, District Judge. The libel in this case sets forth, in its first article, that this is an action founded upon contract, civil and maritime. It sets forth, in its second article, that, in January, 1871, the British barque Woodland being in the port of St. Thomas, in the West Indies, and standing in need of advances for repairs and supplies, disbursements and charges, J. Niles & Co., merchants in St. Thomas, advanced to the master of said vessel, for the purposes of said vessel, and on the credit of said vessel and owners, the sum of $4,606 24, for which the said master drew his two certain drafts or bills of exchange upon the owners of said vessel, dated January 25th, 1871, one for $2,000, in American gold coin, payable ten days after sight, and one for $2,606 24, in American gold coin, payable ten days after

sight, whereby he pledged the said vessel, freight and cargo for the payment of the same, and gave to whomsoever might be the holders of said drafts a lien upon said vessel, freight and cargo; that said J. Niles & Co. took up said money, on said drafts, of the libellants, and duly assigned to the libellants the said drafts, and said demand for repairs and supplies, disbursements and charges, and advances, and the lien therefor upon said barque, freight and cargo; and that the libellants advanced said money on the credit of said vessel and cargo and freight, and are owners of said lien. The third article of the libel sets forth, that said advances, repairs, disbursements and charges were material and necessary for said vessel, without which she could not safely proceed upon her intended voyage and earn freight and passage money; and that the whole amount of said advances, in American gold coin, is due and unpaid to the libellants. The fourth article of the libel sets forth, that neither of said drafts has been accepted or paid, although duly presented to said owners; and that the libellants are the legal owners and holders thereof. The libel prays process against the vessel and freight.

The answer of the owners of the barque (being the same persons who were her owners at the time of the transactions set forth in the libel) denies the foregoing allegation of the first article of the libel. It admits that the barque was in the port of St. Thomas in January, 1871, and denies all the other allegations of the second article of the libel, except as afterwards admitted in the answer. It denies the allegations of the third article of the libel. It admits that, while the barque was at St. Thomas, her master drew three drafts on her owners, and delivered them to the firm of J. Niles & Co. It denies that such drafts created any lien upon either vessel or cargo, and denies that J. Niles & Co. took up the money, on said drafts of the libellants, or assigned to the libellants the drafts, or the alleged demand for repairs, supplies, disbursements, charges or advances, cr the alleged lien therefor, and denies that the alleged advances for which the drafts were given were made for the purposes of the vessel, or on her credit. It avers that a large portion of the alleged advances, if made at all, were made for the pretended purposes of the cargo of the vessel, and on the credit of such cargo, and neither the vessel nor the freight is liable for the same; and that this court has no jurisdiction over the case, and neither vessel nor cargo should be held responsible.

The barque was a British vessel, owned by persons residing at St. John, in New Brunswick. In November, 1870, while on a voyage from Montevideo to New York, with a cargo, she put into St. Thomas, a Danish port, in distress, leaking badly and needing repairs. The firm of J. Niles & Co. had been established there for twelve years, as com-

mission merchants and ship agents. The master of the barque, Captain Titus, applied to J. Niles & Co. to attend to the business of the vessel, stating that he had been instructed to do so by her owners, in the event of his having to call at St. Thomas. J. Niles & Co. took charge of the vessel and cargo. The cargo was discharged and stored, in or-der to ascertain the full extent of the damage to the vessel and to enable the repairs to be made. The vessel was taken out of water, the metal was stripped from her bottom, her bottom and her top sides were recalked, her spars and rigging were renewed or repaired, and she was put into a seaworthy condition to proceed on her voyage with her cargo. Some of the cargo was found to be badly damaged by sea water, and was sold at public auction, and the rest was reshipped on the barque for New York. This occupied about two months. For the balance of the indebtedness claimed by J. Niles & Co., for services and expenses for the vessel and her cargo, after deducting the net proceeds of the damaged part of the cargo that was sold at auction, J. Niles & Co. received from the master three drafts, drawn by him at St. Thomas, on the owners of the barque at St. John, New Brunswick (who are the present claimants of her), payable to the order of J. Niles & Co., in American gold coin, in New York, for the several sums of $2,000, $2,606 24 and $1,500. The drafts were dated January 25th, 1871, and were payable ten days after sight, and each contained, on its face, the words, "place to account of disbursements of barque Woodland and cargo, at this port, and recoverable against the vessel, freight and cargo." The draft for $1,500 was, as Mr. Niles testifies, "returned to Captain Titus, in accordance with agreement, for benefit of owners." J. Niles & Co. first endeavored, unsuccessfully, to obtain the necessary funds through the firm of G. W. Smith & Co., of St. Thomas. They then made an agreement with Captain Titus to raise the required funds by bottomry on the vessel and respondentia on the cargo. But that was not carried out, because it was superseded by a conditional agreement by J. Niles & Co. to take drafts drawn by the master on the claimants. On the 24th of December, 1870, the claimants wrote, from St. John, a letter to Captain Titus, at St. Thomas, to the care of J. Niles & Co., which letter reached St. Thomas on the 11th of January, 1871. In that letter, after acknowl-edging the receipt of advices from the master and from J. Niles & Co., in reference to the disasters to the vessel, the claimants say: "The vessel and freight are but partly insured, but, whether insured or not, you have simply to do your duty. We may say to you, however, that, unless the vessel is much worse than would appear from the vague information furnished us, you would not be justified in having her condemned. Should she be improperly condemned, we

could not recover a penny of our insurance. The underwriters talk of sending out their agents, and will certainly do so, unless they think everything has been fairly and properly done. On the other hand, should it cost more to repair than the vessel will be worth when done (she is valued in the policies at $10,000), we would have trouble, at least, in collecting. As we are so entirely ignorant of the real facts of the case, we can give no positive advice in regard to the foregoing. It seems to us, almost, as if you were out of the world, the communication is so tedious. On receipt of Messrs. Niles' letter, this morning, we were greatly alarmed, and we telegraphed to Heaney & Parker, New York, as follows: 'Send following instructions to Titus, quickest manner, cable or otherwise, namely—make only such repairs as will bring vessel and cargo to New York, hiring extra hands; otherwise, proceed to St. John, under temporary repair, reshipping cargo on other vessel.' This explains itself. Of course, if you have to reship the cargo in another vessel, you will procure as low freight as possible, as the Woodland will receive the difference between what she was to have as per bills of lading and what you may have to pay from St. Thomas to New York. You will also have to retain a lien upon the cargo for its contribution towards the general average expenses. [As soon as Heaney & Parker heard of the disaster, they wrote you to draw on them for funds to pay for your repairs, and sent letters to G. W. Smith & Co., to show their standing. With these, we doubt not you will be able to obtain your funds cheaply, and thereby avoid the great expense of a bottomry; or, if it could be done better, draw on us, either payable here, or in New York, in gold.] We will merely add, that we hope you will use your best judgment, and your best exertions, for the interest of all concerned." G. W. Smith & Co. having declined to furnish the funds, and the agreement to provide them by bottomry and respondentia having been made, the letter from the claimants arrived, and, in consequence of their views expressed therein, the idea of bottomry was abandoned, and the conditional agreement to take drafts drawn on the claimants was made. To carry that out, J. Niles & Co. offered to sell the proposed drafts which were to be drawn to the libellants, at the same time showing to them the passage in the said letter from the claimants, authorizing the master to draw on them, and referring to bottomry, being the passage, above recited, embraced in brackets. After reading the passage, the libellants declined to purchase the drafts, on the ground that they were not acquainted with the standing of the claimants, unless the master would, in drawing the drafts, make them recoverable against vessel, freight and cargo. This was agreed to by the master and carried out. The libellants bought the

two drafts mentioned in the libel, at 2½ per cent. discount, and paid for them in cash to J. Niles & Co. J. Niles & Co. indorsed the drafts in blank and delivered them to the libellants. The money and materials furnished, and the work done, were furnished and done on the recommendation of surveyors appointed with the approbation of the master, and by the authority of the master.

It is contended, on the part of the claimants, that, according to the law of Great Britain, as the law governing in dealings with a British vessel, no implied authority exists in the master of a British vessel, even when in a foreign port, to pledge his vessel for necessaries, by any other form of hypothecation than a formal bottomry; and that the master of this vessel had no such authority, either express or implied.

There is no doubt, that, from the time of Charles II. until the year 1840, it was the law of Great Britain, that no implied lien existed on a vessel, for necessaries supplied or repairs made, so as to enable the creditor to attach and sell her, to pay the debt. The rule established was, that an express, formal instrument of hypothecation was necessary to give a lien for necessaries or repairs; that such instrument must be one making the repayment of the money borrowed dependent on the arrival of the vessel at her destination; and that a master had no authority to hypothecate a vessel in any other manner. Stainbank v. Fenning, 11 C. B. 51; Stainbank v. Shepard, 13 C. B. 418. The high court of admiralty in England took no jurisdiction of a suit against a vessel, founded on such an implied lien. The Two Ellens, L. R. 4 P. C. 161, 166. But, by the general maritime law and the civil law, such implied lien existed, and it extended to all vessels, foreign and domestic; and the courts of admiralty of the United States always took cognizance of suits in rem founded on such implied liens for supplies and repairs, in the case of foreign vessels. The rule of the courts of admiralty of Great Britain operated to the prejudice of persons in Great Britain furnishing supplies and repairs to foreign vessels, and also to the prejudice of foreign vessels, in the ports of Great Britain, in circumstances of distress or necessity, whenever personal credit failed the master. It was, therefore, provided by statute (Act Aug. 7, 1840; 3 & 4 Vict. c. 65, § 6), "that the high court of admiralty shall have jurisdiction to decide all claims and demands whatsoever * * * for necessaries supplied to any foreign ship or sea-going vessel, and to enforce the payment thereof, whether such ship or vessel may have been within the body of a county, or upon the high seas, at the time when the * * * necessaries were furnished in respect of which such claim is made." The courts of admiralty of Great Britain hold that this provision gives a maritime lien on a foreign vessel for necessaries supplied in a British port, which can be enforced in admiralty against the vessel. The Ella A. Clark, 8 Law

T. (N. S.) 119; The Two Ellens, L. R. 3 Adm. & Ecc. 345, 354, and on appeal, in the privy council, L. R. 4 P. C. 161, 167. But such provision only applies to foreign vessels. On the 17th of May, 1861 (24 Vict. c. 10, § 5), it was enacted, that "the high court of admiralty shall have jurisdiction over any claim for necessaries supplied to any ship elsewhere than in the port to which the ship belongs, unless it be shown, to the satisfaction of the court, that, at the time of the institution of the cause, any owner or part owner of the ship is domiciled in England or Wales." This provision is held to extend to necessaries supplied in a British port to a vessel belonging to another British port. But, it has been held by the high court of admiralty (The India, 9 Jur. [N. S.] pt. 1, 417), that the 6th section of the act of 1840 does not apply to necessaries furnished in a foreign port, and that the 5th section of the act of 1861 does not apply to foreign ships. The latter clause of the 5th section of the act of 1861 is held to have the effect to prevent the ship from becoming chargeable with the debt for necessaries at the time the necessaries are furnished, so that all valid charges on the ship, to which any person other than the owner of the ship who is liable for the necessaries is entitled, must take precedence of such debt, as a charge on the ship; but, as against the owner of the ship, the debt for necessaries becomes a charge on the ship when a suit in rem therefor against the ship is instituted. The Pacific, Brown & L. 243; The Troubadour, L. R. 1 Adm. & Ecc. 302; The Two Ellens, L. R. 4 P. C. 161, 170.

I do not deem it necessary to inquire whether the high court of admiralty in England would, under the 5th section of the Act of 1861, take jurisdiction of a suit in rem against this British vessel, to enforce the lien claimed in this case for necessaries supplied to such vessel in the Danish port of St. Thomas. For, I am of opinion that the transactions above recited created no lien on this vessel. I do not mean to intimate that the jurisdiction of this court fails because the necessaries were furnished to a foreign vessel at a port foreign both to her and to the United States, or that jurisdiction in such cases, in rem, cannot be exercised by the admiralty courts of the United States.

The authority of the master of a vessel as to repairing her or supplying her with necessaries, whether abroad or at home, is limited by the express or implied authority derivable from the laws of the vessel's country, or the usage of the trade, or the business of the ship, or the instructions of the owner; and he cannot bind either the vessel, or her owner, beyond such limits. In respect of money advanced in a foreign port, for necessaries, the inquiry is not as to the authority of the master by the law of the foreign port, but as to whether the money was advanced for necessaries, or within the scope of the master's authority, according to the law of the vessel's country. The master has no power to bind the owner

of the vessel, or the vessel herself, beyond the authority given to him by the owner; and the extent of such authority must be limited to the express instructions of the owner, or to instructions to be implied from the law of the country where the vessel belongs and the owner resides. Private instructions, unknown to the person who advances money for necessaries, cannot affect the rights of such person, where he knows that the general maritime law of the country to which the vessel belongs imports authority in the master to make the contract relied on. But, even where such law. in the absence of instructions, would import such authority, instructions which limit such authority will, if made known to the party who contracts with the master, before the contract is made, operate to prevent such party from claiming against the owner of the vessel anything which does not fall within the scope of such limited authority. Abb. Shipp. (Am. Ed. 1829) pp. 190–132; Pope v. Nickerson [Case No. 11,274].

· In the present case, the libellants have put in evidence the letter of December 24th, 1870, from the claimants to the master. That letter. was made known to J. Niles & Co. and to the libellants. It authorizes the raising of the funds by drafts on Heaney & Parker, or by drafts on the claimants, and states that the claimants have no doubt that the master will be able to obtain funds in that way. But it contemplates, as the alternative means, only a bottomry. It authorizes a bottomry if a resort to drafts fails. But it authorizes only drafts or a bottomry. It must be regarded as excluding the master from resorting to anything but drafts or a bottomry, and as excluding him from resorting to the creation of a lien on the vessel by any form of hypothecation other than a bottomry, or to the creation of such a lien as is asserted in this case, whether an implied lien to result from the transactions, or whatever lien the language of the drafts may be claimed to create. J. Niles & Co. and the libellants declined to take the master's drafts, as authorized by the letter, and insisted that the master should undertake to create a lien on the vessel by other means than a bottomry. They insisted that the master should exceed his authority, as defined and limited by the letter.

It is of no consequence to show that a resort to bottomry would have been more expensive to the claimants. They had a right to limit the authority of the master, and they did so. It is of importance to so administer the maritime law, that vessels in distress in foreign ports shall not be deprived of the means of obtaining relief, but it is no less important that masters of vessels, and persons dealing with them with knowledge of the instructions under which they are acting, shall keep within the limits of such instructions.

As this is not a case communis juris, and both parties are foreigners, and the contract was made with reference to the law of the vessel's country, it is a case where the question of the liability of the owners of the vessel can, with especial propriety, be determined by the tribunals of such country.

The libel must 'be dismissed, with costs.

[This decree was affirmed by the circuit court (Case No. 17,977), and the decree of the latter court was affirmed by the supreme court (104 U. S. 180).]