## Case No. 17,977.

### The WOODLAND.

[14 Blatchf. 499.] [1]

Circuit Court, S. D. New York. June 13, 1878. [2]

LIEN ON VESSEL—DRAFTS BY MASTER—REPAIRS IN FOREIGN PORT—FRAUD.

A British vessel, in distress, put into the Danish port of St. Thomas. Repairs to her were necessary. N. attended there to the business of the vessel, and, with the connivance of T., the master, made out fraudulent accounts against the vessel, and T. drew three drafts on the owners of the vessel, for over $6,000, which were expressed, on their face, to be "recoverable against the vessel, freight and cargo." F., in good faith, and without knowledge of the fraud, discounted two of the drafts. They not being paid, F. libelled the vessel and freight, in rem, at New York: *Held*, that the fraud of N. and T. did not invalidate the drafts in the hands of F. *Held*, also, that the question of a lien on the vessel must be determined by the law of Great Britain, and that, by that law, the master had no right to create a lien on the vessel and freight by any other instrument than a bottomry bond.

[Cited in The Wexford, 7 Fed. 679; The Scotia, 35 Fed. 908; The Lykus, 36 Fed. 921; Liverpool & G. W. Steam Co. v. Phœnix Ins. Co., 129 U. S. 450, 9 Sup. Ct. 475.]

[Appeal from district court of the United States for the Southern district of New York.]

[This was a libel by J. H. Fechtenburg and another, trading as J. H. Fechtenburg & Co., against the British barque Woodland. There was a decree by the district court in favor of the vessel (Case No. 17,976), and libellants appeal.]

James Ridgway, for libellants.
George A. Black, for claimants.

HUNT, Circuit Justice. In this cause I find the following facts: "The British barque Woodland, owned by the claimants, who are residents of St. John, New Brunswick, in November, 1870, while on a voyage from Montevideo to New York, with a cargo, being in distress, put into the Danish port of St. Thomas, for repairs. Repairs were necessary before she could safely proceed on her intended voyage. On December 24th, 1870, the claimants wrote a letter, from St. John, to Captain J. H. Titus, the master of the barque, at St. Thomas, which he received on January 11th, 1871, and, before any ad-

[1] [Reported by Hon. Samuel Blatchford, Circuit Judge, and here reprinted by permission.]
[2] [Affirming Case No. 17.976. Decree of circuit court affirmed by supreme court in 104 U. S. 180.]

vances had been made by the libellants, he exhibited the same to them. This letter is set forth in the apostles. J. Niles, who carried on business under the name of J. Niles & Co., attended to the affairs of the vessel at St. Thomas, landed the cargo, and sold a portion of it, on which he received an amount sufficient to reimburse all the moneys expended, and charged commissions and insurance amounting to $6,875. As to the insurance, none was actually effected, and the commissions are on an excessive valuation. Titus, the master, approved all the bills, drew drafts on his owners for the balance, $6,106.24, which were expressed, on their face, to be 'recoverable against the vessel, freight and cargo.' Two of these drafts the libellants discounted, and for them this recovery is sought. The third was given by Niles to the master, upon a corrupt understanding, that it was to be his share. The two drafts have not been accepted or paid, and the libellants are the owners thereof. By the law of Great Britain, the master of a British vessel has no implied authority, even when in a foreign port, to pledge his vessel for necessaries, or create a lien thereon by any other form of hypothecation than a formal bottomry bond; and the master of this vessel had no such authority, either express or implied. The vessel and freight only were libelled in this action. The bills were received, and the money advanced upon them by the libellants, in good faith and without knowledge of the fraudulent acts of Niles and the captain of the Woodland."

Of the facts that the bark put into St. Thomas in distress, that repairs were there made upon her, that the drafts in question were made professedly on account of such repairs, and that the libellants advanced their money upon them, without knowledge of any fraud on the part of Niles and the captain, there can be no doubt.

The bills for the repairs were made out extravagantly, fraudulently and collusively. If the drafts were made by those having authority to act as the agents of the owners of the vessel in such an emergency, and to bind them by drafts given honestly and wisely, I cannot see that the frauds of such agents can be charged upon the bona fide holders of the drafts, so as to defeat their collection. The captain was not the agent, in any manner, of the libellants, but the agent of the owner and of the vessel, so far as his position gave him authority, and for his frauds the owner is the party responsible. It is proved, affirmatively, by the evidence of the libellants, that they paid their money for the drafts before their maturity, and without knowledge or suspicion of fraud or irregularity; and there is no evidence to contradict their statements. I, therefore, find and decide, that, so far as the fraud and irregularity are concerned, the drafts were not avoided in the hands of the libellants.

Neither am I able to concur in the conclusion, that the authority of the captain was limited and restricted by the letter of his owners, dated December 24th, 1870, and which was shown to the libellants. It is contended that this letter authorizes the captain to draw on Heaney & Parker for the expenses, or on the owners, if it can be better done, or to give a bottomry bond, and that it excludes the authority to create a lien on the vessel in any other form. The language of the letter supposed to have this effect, is as follows: "As soon as Heaney & Parker heard of the disaster, they wrote you to draw on them for funds to pay for your repairs, and sent letters to G. W. Smith & Co., to show their standing. With these, we doubt not, you will be able to obtain your funds cheaply, and thereby avoid the great expense of a bottomry—or, if it could be done better, draw on us, either payable here or in New York, (in gold)." The letter proceeds: "We will merely add, that we hope you will use your best judgment and your best exertions for the interest of 'all concerned,' and, inasmuch as you must have friends to advise and assist you, endeavor to select those who are honest and honorable, and have nothing to do with men who would counsel fraud, as too many are disposed to do when they think they have an opportunity to make money out of underwriters." This is a letter from the owners, at a distance, to their captain, in an emergency, giving their advice and counsel, and suggesting what appear to them the best modes of relieving himself and his vessel from the difficulties surrounding them. It advises, first, that drafts be drawn on Heaney & Parker, or that drafts be drawn on them directly, payable either at St. John, N. B., or in New York, and that the expense of a bottomry proceeding be avoided. There is not, however, anything that will bear the construction, that he may not resort to any legal method of obtaining the necessary repairs for his vessel. This is strikingly evident from the clause following, where the letter says: "We hope you will use your best judgment and your best exertions for the interest of all concerned." The sum of it is, that the writers suggest what to them, at a distance, appear to be the better modes of raising the money, but leave it, in the end, to the judgment and discretion of the captain. This left it with him to raise the supplies in any manner that the law would permit. If he had raised them by drafts on Heaney & Parker, or by drafts on the owners, there would have been secured the personal liability of the parties named; if by bottomry bond, with the formalities required by law, a lien would have been created upon the vessel. He took neither of these courses, but drew bills upon his owners at ten days' sight, concluding with these words, "which place to the account of disbursements of bark Woodland and cargo, at this port, and recoverable against the vessel, freight and cargo," and signed them as master; "where-

by," (the libel alleges,) "he pledged the said vessel, freight and cargo for the payment of the same, and gave to whomsoever might be the holders of said drafts or bills of exchange, a lien upon said vessel, freight and cargo;" and the libel prays that the court may condemn the said vessel, her freight and cargo, to pay the said sum, with interest and costs.

The question here presented is—did the transactions described, or did the drafts thus given and thus expressed, create a lien upon the vessel and her freight? Had this English master of an English vessel authority to create a lien in the foreign port of distress, in any other mode than by a written instrument of hypothecation, which made the debt dependent upon the safe arrival of the vessel, to wit, by a bottomry bond? If the vessel had sailed under the flag of the United States, and her master had been a citizen of the United States, this question would be answered in the affirmative. The case of The Emily Souder, 17 Wall. [84 U. S.] 666, decides, that the furnishing of the supplies and materials in a foreign port of distress, itself creates a lien upon the vessel in favor of the person furnishing them, and that such lien is not destroyed by the acceptance of drafts on the owners, in the ordinary form, making no reference to the lien, and the departure of the vessel from the port of distress, and that the admiralty has jurisdiction to enforce this lien against the vessel.

But, it seems to be settled, that the question is to be determined by the law of the country of which the master was a citizen, and under whose flag the vessel sailed, and not by the law of the port where the supplies were furnished, or of the country where the lien is sought to be enforced. Lloyd v. Guibert, 6 Best & S. 100, 117.

On the point of the right to create the lien otherwise than by bottomry security, reference is made to Carrington v. Pratt, 18 How. [59 U. S.] 63, where Nelson, J., uses this language: "It has been recently held, in the court of exchequer, in England, that the master can pledge the ship for repairs, or loan of money for that purpose, in the foreign port, only by bottomry security; and that, in the absence of this, the merchant must look to the responsibility of the owner or master." The point was not decided in that case, but was expressly waived by the court. In Stainbank v. Fenning, 11 C. B. 51, the master borrowed money necessary for repairs, and gave a mortgage or hypothecation of the vessel for the amount, payable absolutely, and drew bills on the owner for the same, the payment not being made dependent on the arrival of the vessel. It was held, that the lenders could not proceed against the vessel in the admiralty court of England, and, therefore, had no insurable interest on which the suit could be maintained. Stainbank v. Shepard, 13 C. B. 418, was an action by the same plaintiff against different defendants, upon substantially the same facts, and it was held, that, there not being such an hypothecation as could be enforced in the court of admiralty, the payment of the money not being made to depend upon the arrival of the vessel, the merchant had no insurable interest in the ship. Both of these cases were decided upon the ground, that it is essential to the validity of hypothecation, that the sea risk should be incurred by the lender, and that the pledge on the ship should take effect only in the event of her safe arrival. The opinion in the latter case was delivered by Baron Parke, and in the former by Jervis, Chief Justice. In each case, as in the case before us, the instrument of hypothecation was accompanied by the drafts of the master upon the owners. Upon the authority of these cases, and from my high respect for the experience and learning of the district judge who decided this case below, I shall affirm the decree dismissing the libel [Case No. 17,976].

The amount in controversy, with the added interest, make this case one which can be carried by appeal to the supreme court of the United States, and I make the decision with the less hesitation, knowing that the party can correct the error, if there be one, by such appeal. Should I be mistaken in supposing that there is a right of appeal, I will entertain a motion for a rehearing, and confer with such of my brethren of the supreme court as I may be able conveniently to reach.

[This decree was affirmed on appeal to the supreme court. 104 U. S. 180.]