## THE BRIG WEXFORD.

*(District Court, S. D. New York.   February 5, 1881.)*

1. LIEN FOR MATERIALS—LACHES—TAKING OTHER SECURITIES—WAIVER —MORTGAGEE—POSSESSION—LIEN ON FREIGHT MONEYS—LIEN OF MASTER—EXTRA WAGES—DISBURSEMENTS—MARSHALLING ASSETS— ATTACHMENT—COMMISSIONER'S FEES.

   A libel was filed against the English brig W. and freight for seaman's wages, including the master's. Process issued against the vessel only. The owner did not appear, and the proceeds of sale were paid into the registry. C. & Co sued *in personam* the master and owners for advances in a foreign port to purchase supplies, and attached the freight, which was also paid in. Several others, including C. B. & Co., libelled the ship for materials supplied. A mortgagee claiming possession, petitioned to be paid out of the freight, as well as the proceeds of the vessel. The claims exceeded in amount the whole fund in the registry. The testimony showed that C. B. & Co. furnished supplies in April, 1877, for coppering the vessel in this port, where the owner resided; but they suffered her to leave without payment. Afterwards they took the owner's notes in payment, and subsequently, the notes not being paid, a second mortgage on the vessel as security. Although she returned to this port several times, there was no arrest by them until they filed this libel, in July, 1880. On exception to the report of the commissioner, to whom by consent it was referred to take testimony and determine the liens, if any, their priority, etc.,—

   *Held*, that, conceding C. B. & Co. had a lien, which, on the evidence, is doubtful, still the extraordinary laches shown by them, and the taking a second mortgage, indicated an intention not to rely upon their admiralty lien, if indeed such lien was not extinguished by the mortgage.

That their claim was not entitled to any favor as against subsequent lienors not guilty of laches, and was rightly postponed by the commissioner to that of the other material men; that even the first mortgagee had also the right to insist upon the waiver.

*Also held*, that the first mortgagee's possession, to entitle him to a lien on the freight, must have been such as to terminate the owner's possession, and that having failed on the evidence to show he had the actual custody of the vessel, so as to earn the *freight, by delivering the cargo, he had no lien thereon.

*Also held*, that the master was entitled to a lien for wages and extra wages, under the British shipping act, equally with the seamen, there being no evidence that he had caused the delay in payment. The lien for wages extends to extra wages. 3 FED. REP. 577.

*Also held*, that the claim of C. & Co., as against the owner, was in the nature of a disbursement by the master for the ship, for which he had a lien on the freight under the British shipping act.

*Also held*, that the voluntary omission of the seamen in not attaching the freight did not prevent the admiralty court from marshalling the assets, and that both funds being in court, and all the parties heard, it was unnecessary to compel the seamen to file a petition against the freight in order to effect such marshalling of the assets.

That the first mortgagee having suffered the owner to remain in possession and employ the master, the latter's lien was entitled to priority over his.

*Accordingly held*, (the exceptions not raising the question whether material men are prevented from acquiring a lien against a British vessel in a foreign port by reason of the provisions of the British merchants' shipping act,) that after paying the commissioner's fees out of the vessel and freight in the proportion of the two funds, the claim of C., & Co., the seamen, and the master, in the order named, should be paid out of the freight.

That out of the proceeds of the vessel should be paid the amounts due the pilot, material men, and balance due the master, in the order named, and the remaining proceeds of vessel, if any, to mortgagee.

In Admiralty.

*Hill, Wing & Shoudy*, for mortgagee.

*Beebe, Wilcox & Hobbs*, for Crocker Brothers & Co.

*W. W. Goodrich*, for master and seamen.

*George A. Black*, for Crossman and others.

CHOATE, D. J. The brig Wexford, an English vessel belonging to Nova Scotia, was libelled in this court in a suit for seamen's wages. The libel was against vessel and freight, but process issued only against the vessel. She was condemned and sold, and the amount of the proceeds of the vessel in the

registry is $2,075. The owner did not appear. Several other parties filed libels against the vessel, or petitions to be paid out of the proceeds, the claims exceeding in the aggregate the whole amount in the registry. One Crossman also commenced a suit *in personam* against the master and owners of the vessel, on a draft drawn by the master on the owners for money advanced at a port on the coast of Africa to the master for the purpose of obtaining necessary supplies for the vessel in that port. On this libel the freight was attached in the hands of the consignees of the cargo, as belonging to the owners, and has been paid into court to the amount of $703.04. Among the claims presented against the vessel was that of a mortgagee, who also claimed the freight on the ground that after the arrival of the vessel in this port, and before the discharge of the cargo, he had taken possession of the vessel. The parties having claims on the vessel insist that the freight should be applied to payment of the seamen's wages in order that they may make good their claims against the vessel. By consent of all parties who appeared in the suit of Crossman, and also in the suits against the vessel, it was referred to a commissioner to take proof of the amounts due the several parties, determine their liens, if any, and their claims for priority of payment, and the proper mode of marshalling the funds in the two suits, without formal pleadings other than the libels and petitions of the respective parties. The parties appeared before the commissioner, and the amounts found due them are as follows: Crocker Brothers & Co., a corporation doing business in this city, have proved a claim for $837.84, for copper supplied to the vessel in this port in April, 1877, subject to the objections hereinafter stated. Their libel was filed July 6, 1880. The following claims were also proved, as to which no objection is now taken: Richard H. Anderson, of Philadelphia, for supplies in that port in April, 1880, $319.55; Charles A. Warren & Co., of Philadelphia, for supplies and materials furnished in that port, $102.58; Owen Reilly, for supplies, $17.80; James Germond, for pilotage in this port, $64.57; Joseph

M. Wright & Co., of Rio Janeiro, for supplies and repairs furnished to the vessel in that port, $380.03; James T. Abbott, for advances in port of St. Thomas in March, 1879, $193.03. The libels in all these cases were filed subsequently to that of Crocker Brothers & Co.

The master's claim for wages was proved at $504.04, including extra wages for 10 days' double pay on account of delay in payment. Crossman's claim in his suit *in personam*, for advances on the coast of Africa, was proved at $77.12. The mortgagee proved a balance of $1,500 due to him. The commissioner inadvertently reported this at $5,000. The mistake is conceded. The commissioner held that the freight should be applied first to the payment of the claim of Crossman, and that the balance should be paid to the mortgagee, on the ground that the mortgagee had taken possession of the vessel before delivery of the cargo. He also held that the proceeds of the vessel, after paying the wages of the seamen, should be applied as follows:

(1) To pay the claim of Germond, pilot.

(2) To pay the claims of Anderson, Wright & Co., Abbott, Warren, and Reilly, material men, in the order in which their libels were filed.

(3) To pay the master's wages, including extra wages on account of delay in payment.

(4) To pay the claim of Crocker & Co., material men, this claim being postponed to the claims of the other material men on account of their laches in filing their libel, and to that of the master on account of his superior equitable claim upon the fund.

The claims of the seamen were proved at $360.62.

The master excepts to the report on the ground that his wages should be paid out of the freight either next after payment of Crossman's claim or next after payment of Crossman and the seamen. Crocker Brothers & Co. except on the ground that their claim should be paid out of the proceeds of the vessel before the claims of the other material men, whose libels were filed after that of Crocker Brothers & Co.; also

on the ground that the freight should first be applied to payment of the seamen's wages; also on the ground that Crossman is not entitled to be paid until all liens on vessel and freight have been first paid; also on the ground that the material men, whose claims cannot be paid out of the vessel, are in equity entitled to be paid out of the freight in preference to the mortgagee; also on the ground that the master is not entitled to extra wages; or, if so, that such extra wages do not constitute a lien, and that the master's lien against the vessel is not entitled to priority over that of Crocker Brothers & Co. The mortgagee excepts on the ground that Crocker Brothers & Co. had no lien on the vessel; also on the ground that Crossman is not entitled to be paid out of the freight; also on the ground that the mortgagee is entitled to the whole of the freight; also on the ground that the master is not entitled to be paid out of the vessel in preference to the mortgagee; also on the ground that the master is not entitled to any extra wages out of the proceeds of the vessel before payment of the mortgagee. No objections are understood to be taken to the result reached by the commissioner except those raised by these exceptions.

The first question to be considered in respect to the claim of Crocker Brothers & Co. is whether they have a lien on the vessel for the copper supplied to her in April, 1877. To the lien claimed by them several objections are made—*First*, that the vessel was an English vessel, and that, by the law of England, the master has no authority to bind the vessel in a foreign port for supplies and materials, otherwise than by a bottomry bond; *secondly*, that in this case the owner of the vessel resided in this port, and that in such case there is no lien, though the vessel be under a foreign flag; *thirdly*, that in this case credit was not given to the vessel; *fourthly*, that their lien, if they ever had one, was waived by taking a subsequent mortgage; and, *lastly*, that it was forfeited by laches.

As to the first objection, formal proof of the English law was not made, as it should have been, since the court does

not take judicial cognizance of foreign laws; but it has been assumed on both sides that the English law is what it is shown to be by the decisions of the English courts, and I, therefore, shall hold formal proof to be waived. It is conceded that, independently of recent statutes, the English courts, including the court of admiralty, denied the authority of the master of an English ship to bind the vessel even in a foreign port for materials and repairs otherwise than by bottomry. *The Woodland,* 7 Ben. 110, and cases cited; S. C. 14 Blatchf. 499, and cases cited. It is, however, unnecessary to pass on this objection to this alleged lien, since the circumstances show that if the lien ever attached it has been waived and lost by the subsequent acts of the party. The copper was furnished in April, 1877, for the coppering of the vessel then in this port. She was allowed to leave the port without any effort on the part of Crocker Brothers & Co. to secure payment of the bill. On their books the copper was charged to the vessel upon their knowledge that she was a Nova Scotia vessel, but with no knowledge and no inquiry as to where her owners resided, and the bill was sent to a firm doing the business of such vessels here, who it was supposed at the time were acting as agents for this vessel. After the bill had remained unpaid, their managing agent learned that one De Wolf, whom he knew as residing in Brooklyn and doing business in this city, was the owner of the vessel, and he called upon De Wolf for payment. De Wolf admitted his liability, thereby ratifying the assumed agency of the master, certainly so far as he was personally concerned, but declared his inability to pay at that time. After several demands the libellant took De Wolf's notes at six months, which were dishonored at maturity. De Wolf paid, however, $250 on account, and after the dishonor of the notes the libellants took a second mortgage on the vessel, payable in one year, for the amount due, which mortgage they had recorded at her port of registry in Nova Scotia. After April, 1877, the vessel returned to the port in September, 1877, and again in January, June, and October, 1878, and in June, 1879; yet

no libel was filed against her on this claim till her arrival here in July, 1880. There is evidence that on one occasion when she was about to sail the libellants threatened to arrest her, but were dissuaded by the owner. Permitting the vessel thus repeatedly to leave the port is a circumstance strongly tending to show an intention to rely on other security. The taking of a mortgage known at the time to be a second mortgage and subordinate to that held by the first mortgagee, which was given in 1875, especially under the circumstances of laches above narrated, showed a purpose not to rely on the lien, if, indeed, the mortgage did not necessarily extingush it. See *The Ann C. Pratt,* 1 Curt. 351. See, also, *Fish* v. *Howland,* 1 Paige, 20; *Manly* v. *Slason,* 21 Vt. 271.

The laches here have been extraordinary, and such as to disentitle this party to any favor in a court of admiralty. As against the owner, who has admitted his claim, he might be paid out of the proceeds; but as against subsequent lienors, who have not been guilty of laches, and who stand to him in at least as favorable a relation as subsequent *bona fide* purchasers, the lien is clearly gone. The ruling of the commissioner on this point, postponing the claim of Crocker Brothers & Co. to those of the other material men, was entirely correct. *The Artisan,* 8 Ben. 538, and cases cited. It is no answer to say that these claimants did not know of the repeated returns of the vessel. I am not satisfied upon the proofs that their agent here had not information of it, but it was their own negligence if they did not know of it. They had ample means of ascertaining the fact, and their failure to collect their debt before she left the first time made it incumbent on them to use increased diligence thereafter, if they would protect their lien against the newly-accruing claims of parties trusting her in ignorance of their claim. As to the first mortgagee, undoubtedly he does not stand in the same favorable position in this respect as the subsequent lienors, but he has a right to insist that these parties waived their lien and took other security, a second mortgage, in lieu

thereof. *The Ann C. Pratt, ut supra.* The attempt to show by testimony that the second mortgage was not so taken, was not, I think, successful. The testimony of the agent was evasive and unsatisfactory. The first mortgagee has also right to insist that the laches and subsequent acts of these parties, by the rules of the maritime law, amount to an absolute waiver and abandonment of the lien, or claim, against the vessel. *The Boston,* Bl. & How. 327; *The President,* 4 Wash. 453; *The Key City,* 14 Wall. 660. And both these points are, I think, made out. Whether Crocker Brothers & Co. ever had a lien (aside from the question of the ship being English) I do not pass upon. It is, at the best, very doubtful, both on account of the slight evidence of their giving credit to the vessel, and their means of knowledge of the owner's residence.

As no exception is taken to the allowance of the claims of the other material men, I am not called upon to decide the question, as to them, whether the fact that the vessel was English prevented their liens from attaching.

The claim of the mortgagee that he took possession of the vessel before the discharge of the cargo, so as to entitle him to the freight as against the owner, is not sustained by the evidence. The proof is that he came on board the vessel with a man whom he employed to act as a ship-keeper, found the mate and steward on board, the master being absent; that he told the mate that he took possession under his mortgage, reading to the mate as much of his papers as the mate was willing to listen to, and then left; that he told the ship-keeper that he need not remain on the vessel all the time; that the ship-keeper in fact then only remained about an hour, when he left. There is evidence that the ship-keeper subsequently returned and was on the vessel more or less down to the time of the discharge of the cargo. There is no evidence that the mortgagee ever took the actual custody and possession of the vessel. Prior to his going on board, the master and crew were in possession as agents of the owner. The possession of the mortgagee, to avail him at

all, must have been such as put an end to that of the owner. But there is nothing to show that the master knew anything of his having come on board, or of his ship-keeper being there, or that he or the mate or the steward submitted to his pretended possession, or acted or consented to act under his direction and authority in completing the voyage by delivering the cargo. Yet these things must be proved to show an actual possession, or to entitle him to the freight. He cannot, surely, have the freight unless he earned it by the delivery of the cargo. All that the evidence shows is that the presence of himself and of his ship-keeper or agent was tolerated by the master and crew, while they continued their former possession to the completion of the voyage and delivery of the cargo. See Maclachlan, Mer. Ship. 41, 100, and cases cited.

The lien of the master for his wages, is, by the British Merchant Shipping Act, 17 and 18 Vict. 104, the same as that of the seamen, and he is equally entitled with them to extra pay in case of delay in payment of the wages unless he himself causes the delay. *The Princess Helena,* Lush. 190. By a subsequent statute, 24 Vict. 10, his lien was extended to cover his disbursements for the ship, and this has been construed to include liabilities incurred. *The Feronia,* L. R. 2 Ad. 65, and cases cited. It has been already held in the case of this same vessel that the seamen's lien for wages extends to their extra wages. 3 FED. REP. 577. The commissioner was therefore right in reporting the master's claim with the addition of extra wages.

The mortgagee, having shown no interest in the freight, cannot contest the claim of Crossman, under his attachment in his suit *in personam* against the master and owners, to have his claim paid out of the freight. Crossman obtained a lien upon it as against the owners by his attachment, subordinate, of course, to the lien of the seamen. It seems also, from the authorities above cited, that, as this was a disbursement of the master for the ship, the master has a lien on the freight to secure it.

Crocker Brothers & Co. excepted to the allowance of Crossman's claim, but they have no interest in the freight which makes their exception available.

Courts of admiralty recognize and enforce in proper cases the equitable rule that where one creditor has two funds to resort to, and another has but one, the creditor having two will be compelled to resort first to that which the other creditor is not entitled to resort to, in order that both may be paid. *The Sailor Prince*, 1 Ben. 234, 461. It is objected in this case that the seamen's and master's wages should not in this case be paid out of the freight rather than the vessel for the relief of those having claims on the vessel, because the freight was not attached on the libel of the seamen, but was brought into the registry on the suit of Crossman, *in personam*, against the master and owners. But I think this is not a sufficient objection. The equitable rule is not limited or narrowed by the voluntary acts or omissions of the creditor having the two funds to resort to. In this case no claim is directly made against the freight, that of the mortgagee being excluded, except that of Crossman. This leaves some $630 of the freight money of this vessel in the registry of the court for distribution. It is, in fact, subject to the lien of the seamen and master. Even if the owner had appeared to claim it, it would be proper, upon the application of the subsequent material men and the mortgagee having claims on the vessel which are in danger of being lost by reason of the payment of the wages out of the vessel, to order the seamen and master to file their petitions to be paid out of the freight. Inasmuch, however, as their libel was against both vessel and freight, though only the vessel was in fact attached on the process taken out by them, it seems to be unnecessary to go through this form. Both funds being in court, and all the parties in interest having been heard, such order for the marshalling of the assets may be made as equity may require.

I think there is no force in the claim of the mortgagee that he should have priority over the master out of the proceeds

of the vessel. The mortgagee, by suffering the owner to remain in possession and employ a master, cannot object to the master having that security against the vessel which the law gives him. The lien of the master for his wages is given in aid of an equity so strong that, even when not supported by lien, it has been held to be superior to the claim of the mortgagee, at least so far as regards the master's wages for the last voyage. *The Trimountain,* 5 Ben. 246.

This disposes of all the questions that have been raised. The fees of the commissioner may be paid out of vessel and freight in the proportion of the two funds. Out of the freight will be paid the claim of Crossman and his costs, then the seamen, then the master. Out of the proceeds of the vessel, the amounts found due the pilot and undisputed claims of material men, then the balance due the master, and anything remaining of the proceeds of the vessel to the mortgagee.

Decree accordingly.