## THE LYKUS.[1]

### SALMON *v.* THE LYKUS.

(*District Court, S. D. New York.* November 27, 1888.)

1. SHIPPING—BOTTOMRY—MASTER'S DRAFTS—CHARTER-PARTY—CONSTRUCTION— DIFFERENCE IN FREIGHT—ADVANCES ON CARGO.

The charter of a steamer provided that difference of freight should be settled at port of loading. At a port of loading the charterer induced the master to sign an obligation many times in excess of the freight, ostensibly for "last disbursements and difference of freight," but actually for advances on the cargo·

---

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

made by charterer; in other words, the purchase price of the cargo, in whole or in part. The obligation pledged the vessel for its payment, and was payable only on condition of arrival at port of destination. On arrival, no consignee appearing to claim the cargo, it was sold by the collector. *Held*, on a libel by an alleged *bona fide* indorsee of the obligation, that the master had no right under the charter, or the maritime law, in settling difference of freight, to take into account such advances; that out of the money for which the cargo was sold the vessel was entitled to her full freight, and the libelant was entitled only to the residue.

2. SAME—NECESSITY FOR BOTTOMRY—LIEN.

Though a master's obligation be in the form of bottomry, if the ship is under no such necessity as would authorize bottomry, and the charter does not authorize it, no lien is thereby created on the vessel.

3. SAME—MASTER'S DRAFT—NEGOTIABILITY.

A master's bottomry obligation, payable to order on arrival at port of destination, is not such a negotiable instrument as to give the indorsee any better rights than those of the payee.

In Admiralty. Action on master's obligation, given in settlement of freight.

The above libelant brings suit to recover as indorsee of a bill for £1,140.13.2, ($5,543.56,) drawn by the master of the steamer Lykus, at Catania, Sicily, in the following words:

"£1140.13.2 CATANIA, 15th January, 1888.

"On arrival at port of destination of the steamer called 'The Lykus,' of which I am the master, now lying at Catania, loaded with sulphur and fruit, and ready to sail for New York, I promise and bind myself to pay to the order of Pietro Tassi, Esq., one thousand one hundred and forty pounds and thirteen shillings and two pence sterling, in cash or approved banker's demand bills on London, value received, for necessary last disbursements and difference in freight of the above vessel at this port, for the payment of which I hereby pledge my vessel. This is my obligation, which settles definitely every accounts with the charterer, and I have signed this in settlement and fulfillment of the obligations contracted by my owners, Messrs. Parson & Linton, Sunderland, with the charter-party dated London, 10th December, 1887, and I give this bill on their name, account, and order, and acting as their empowered representative. Any other obligation or draft by me drawn to be secondary to this. GEO. H. SMITH, Master of S. S. Lykus."

The payee, Pietro Tassi, held a freight charter of the steamer, dated December 10, 1887, containing the following provisions:

"What cash the master may require for steamer's ordinary disbursements to be advanced [*i. e.*, on account of the stipulated *hire* of the ship] by the charterer's agents at ports of loading; * * * the balance to be paid in cash on the true delivery of the cargo; * * * the master to sign bills of lading, as tendered, without prejudice to this charter-party; difference of freight between bills of lading and chartered freight to be settled at last port of loading; if in captain's favor, by cash, less insurance; if in charterer's favor, by captain's bill, payable on steamer's arrival at port of discharge; and all claims on charterer to cease after such settlement."

The cargo shipped by the charterer included, among other things, two shipments of fruit, for which bills of lading were tendered to the master, and signed by him,—the one for 1,889 boxes of oranges, at the "freight" of £887, British sterling; the other for 1,765 boxes of oranges and lemons at the "freight" of £870, British sterling. The "freight" named in these

bills of lading was not in fact the mere freight for the goods, but was many times in excess of the freight proper. The sums called "freight" in the bills of lading included, as was stated to the master by the agent of the charterer, advances made by the charterer upon the fruit; that is to say, the purchase price of the fruit at Catania, wholly or in part. The cargo arrived in New York in good condition, but the "freight" so called, was much in excess of the whole value of the fruit; and, no one appearing to claim it, it was taken possession of by the collector, and sold by him at auction, bringing fair prices, but netting less than half the price of the so-called "freight." The answer alleges that the master's draft was procured by fraud, and was made by the master without authority; that upon crediting the libelant with the freight collected upon the other parts of the cargo, and with the net amount realized from the fruit, there is a balance due the charterer of $462.96, which was tendered and paid into court with the answer, on account of the draft of $5,543.56.

*Wing, Shoudy & Putnam,* for libelant.

*Butler, Stillman & Hubbard,* (*Wilhelmus Mynderse,*) for claimant.

BROWN, J. This suit being *in rem,* the libel cannot be sustained, unless a lien upon the ship is established. The case differs in some important respects from that of *The Woodland,* 104 U. S. 180, 7 Ben. 110, and 14 Blatchf. 499. In that case the drafts were drawn, "payable ten days after sight," and contained the words, "recoverable against the vessel, freight, and cargo." There was no express pledge of the vessel. The drafts were not bottomry drafts, but were designedly given in lieu of bottomry. 7 Ben. 113, 115. In the present case the bill expressly pledges the vessel for payment, and is made payable only on condition of arrival at the port of destination. Such drafts constitute, in form, valid bottomry. *Force* v. *Pride of the Ocean,* 3 Fed. Rep. 162; *Force* v. *Insurance Co.,* 35 Fed. Rep. 767. But the master had no authority in this case, under the general maritime law alone, to execute bottomry; for the vessel was under no such necessity as would authorize bottomry. The consideration of the draft was in part for "necessary last disbursements;" but these advances by the charterer were not made as a loan to the ship, but in part payment of the hire, pursuant to the stipulations of the charter. No bottomry could be lawfully executed for such advances; nor does the maritime law authorize bottomry in order to settle in advance differences of freight. The draft, on its face, moreover, purports to be given merely in fulfillment of the obligations of the charter-party. The master's authority, either to make this draft or to bind the ship for its payment, must therefore be sought in the charter-party alone.

Two questions are presented. *First,* as to the right of Tassi, the payee and charterer, to enforce the draft; *second,* the rights of the libelant, as an alleged *bona fide* indorsee.

1. The libelant is, in this case, in no better position than the payee. Though this bill, being drawn to order, is doubtless transferable by in-

dorsement, it has not those qualities of negotiable paper under the law-merchant, that give superior rights to a *bona fide* indorsee before maturity. This bill lacks the essential conditions of·such paper, since the obligation to pay is conditioned on the arrival of the vessel at her destination, and is not payable absolutely in money, but may be paid in demand bills on London.    *Coolidge* v. *Ruggles*, 15 Mass. 387; *Nunez* v. *Dautel*, 19 Wall. 560; 2 Daniel, Neg. Inst. 43.    In the case of *The Woodland, supra*, the instrument was a·bill of exchange proper, payable "10 days after sight."'   As the bill, moreover, on its face purports to be made under the charter alone, the indorsee had constructive notice of the contents of the 'charter, and of its limitations on the master's authority. Again, there is not a word in this charter that authorizes the master to pledge the ship, or to create any express lien on her, for the payment of the bill that he was thereby authorized to execute.    If any lien, therefore,' attaches to the ship for the payment of such a draft, it cannot stand upon the master's express contract alone, for the charter gave him no such authority; it can stand only upon the implication of the general maritime law, which might possibly attach a lien to the ship as an implied security to the charterer for the fulfillment of the ship's obligations under the charter-party.   See *The Scotia*, 35 Fed. Rep. 909, 9l7; *Freeman* v. *Buckingham*, 18 How. 182, 189.    It is unnecessary to inquire here whether such an implied lien would arise for the payment of obligations like the present, properly given, because no such lien could in any event be upheld beyond what the ship actually owed on a fair settlement under the charter; and the indorsee of the draft would therefore take no greater' lien than Tassi, the payee.    In this respect the· decision of the supreme court in the case of *The Woodland, supra*, upon this precise point, is strictly applicable.    If it be said that the master's representation on the face of the bill was that its amount was due "for advances and difference of freight, pursuant to the charter-party," and that the indorsee was misled by that statement, this would not aid the libelant in any claim of a lien upon the ship.    The situation is no better for a *bona fide* indorsee than that of a *bona fide* holder of a bill of lading, signed by the master, stating the shipment of goods not in fact put on board.    It is well settled that no obligation on the ship or her owners in such a case arises, since the master has no authority to bind either in that way.    *Freeman* v. *Buckingham*, 18 How. 182; *Pollard* v. *Vinton*, 105 U. S. 7; *The Querini Stamphalia*, 19 Fed. Rep. 123, 125; *Sears* v. *Wingate*, 3 Allen, 103. In every point of view, therefore, I must hold the rights of the indorsees of such drafts no better than those of the payee.    The Italian authorities, cited by counsel, have reference, as I understand, solely to transactions within the scope of the master's authority.    This was in clear excess of authority.

2. As respects Tassi, the case seems clear.    The advances made by him upon the fruit were plainly not "freight."    The master had no right to include such advances under the word "freight" in the bill of lading, nor to take them into account in settling " difference of freight" under the charter.    If such advances might be included under the term

"freight" in the bill of lading, for the purposes of collection from the consignees on delivery, this did not give the charterer the slightest claim to have such advances included in the bill to be drawn in the settlement of differences. The charter expressly provides that the bills of lading, signed as presented, should be "without prejudice to the charter." It is unnecessary to consider here whether any such settlement under clauses of this character should be deemed other than provisional, as treated by the parties in the cases of *Eisenhauer* v. *De Belaunzaran*, 26 Fed. Rep. 784, 790; *Naval Reserve*, 5 Fed. Rep. 209; for no fraudulent settlement can be upheld; and this whole transaction was plainly fraudulent as against the ship and her owners. Under the guise of a settlement of differences of freight, pursuant to the charter, the master was induced by Tassi to include under the name of "freight" alleged advances on the goods, exceeding their value; and the ship and owners, instead of being mere carriers, were thus sought to be turned into purchasers of the cargo. On arrival, no consignees appeared to claim the goods under the bills of lading. The unavoidable inference is that Tassi did not expect that anybody would appear. No such "settlement" can stand. The goods having been entered and sold by the collector in default of anyone appearing to claim them, the vessel is entitled to be paid out of the net proceeds her full freight, according to the usual market rate. The libelant, as indorsee of the draft, is entitled only to the residue, and as this amount, $462.96, has been tendered and paid into court without objection, judgment may be entered for that sum less the defendant's costs.