## THE "JULIA BLAKE."

1. The master of a vessel can neither sell nor hypothecate the cargo, except in case of urgent necessity; and he can only lawfully do what is directly or indirectly for its benefit, considering the situation in which it has been placed by the accidents of the voyage.

2. The necessity under which he acts is a question of fact, to be determined in each case by its circumstances; and upon his hypothecation of the cargo under his implied authority the lenders are chargeable with notice of the facts on which he appears to rely as his justification, and they must make inquiries and judge for themselves and at their own risk whether the owner, if present, would do or ought to do what, in his absence, the master is undertaking to do for him. Before there can be a recovery against the owner, it must be shown that the circumstances were such as to make it apparently proper for the master to do what he has done. To this extent the burden of proof is clearly on the lenders.

3. Where it appears that from the port where the vessel entered in distress the cargo could be forwarded by another vessel, and that it was for the interest of the shipper that it should be so forwarded, instead of being hypothecated to pay for the repairs of the vessel, and that they could not have been effected without an expense to him of very much more than it would cost to reclaim his property, pay all lawful charges on it, and forward it by another vessel, — *Held*, that the master had no authority to pledge the cargo without the consent of the shipper or the consignee.

4. Although the bottomry bond cannot be enforced against the cargo, the latter will not be held in that suit for any charges which the vessel may have thereon, where a claim for them is not made in the libel.

APPEAL from the Circuit Court of the United States for the Southern District of New York.

The case is fully stated in the opinion of the court.

*Mr. George De Forest Lord* for the appellant.
*Mr. Everett P. Wheeler* for the appellee.

MR. CHIEF JUSTICE WAITE delivered the opinion of the court.

This is a suit instituted by the Bank of St. Thomas, as the holder of a bottomry bond, against the British brigantine "Julia Blake," her cargo and freight. The decree of the District Court condemned the vessel and freight, but acquitted the cargo and its claimants. No appeal was taken on behalf of the vessel and freight, but the libellant carried the case to the Circuit Court for a review of the decree as to the cargo. The

bond was for $11,600, with fourteen per cent marine premium, and the net proceeds of the vessel and freight were about $3,500. On the hearing in the Circuit Court the libel was again dismissed as to the cargo, and from a decree to that effect this appeal was taken.

The facts found by the Circuit Court, on which, in our opinion, the rights of the parties depend, may be stated as follows: —

The "Julia Blake," a British vessel, owned by Peter Blake, of Nova Scotia, left Rio de Janeiro on or about the 31st of March, 1876, for New York, having on board a cargo consisting of five hundred and eighty-two logs of rosewood. The bills of lading were three in number, and were drawn to the order of James Philip Meé, of Rio de Janeiro, the shipper, for two hundred and fifty-three, one hundred and thirty-nine, and one hundred and ninety logs, respectively. About two hundred of the logs belonged to Mee, but the claimants had made advances on them to him. All the rest belonged to the claimants. The charter-party was dated March 16, 1876, and named Mee as the charterer. The stipulated freight was £220, of which £110 was paid in advance.

Mee gave the master of the vessel on sailing a letter of instructions, directing him to proceed to New York and there consign his vessel and cargo to Winthrop Cunningham & Sons, Philadelphia, the claimants, or their agents, and if compelled, by stress of weather or other accident, to put into St. Thomas, to consign the vessel to Lamb & Co. The voyage was prosecuted with safety until the 3d or 4th of May, on one of which days the rigging of the vessel parted, and her masts fell, the mainmast breaking at the saddle, about six feet above the deck, the foremast at the head. The fallen spars and wreck remained for some time alongside and thumping before they could be cleared away. This rendered it imprudent to prosecute the voyage, and the master properly made for St. Thomas as a port of distress, where he arrived on the 27th of May. On his arrival he applied to the acting British consul, who directed a survey to be made by the harbor-master, the principal shipwright at the port, and the master of a vessel. They properly recommended a discharge of the cargo, and it

was necessary to strip the vessel of her copper to stop the leak. The cargo was discharged, and on the 8th of June a second survey ordered by the consul on the application of the master. A copy of the report of the second survey, although in evidence, is not incorporated into the findings, nor are its contents stated, further than that the vessel was making as much water as at the time of the first survey, and that her metal had been much broken and was torn away and ragged.

When the master arrived at St. Thomas he went to several mercantile houses and seemed to be seeking a proper party to whom to consign the vessel. He finally went to Lamb & Co. and engaged them to attend to the business of the vessel and the repairs. He did not show them his charter-party or letter of instructions, but told them he had lost those papers.

Upon the arrival of the vessel at St. Thomas the master wrote his owner as follows : —

" S. S. ' Beta,' *via* Halifax.

"SAINT THOMAS, 27th May, 1876.

"PETER BLAKE, Esq.. Parsboro, Nova Scotia :

"DEAR SIR, — I regret to have to report that the brigantine "Julia Blake," on her voyage from Rio de Janeiro, encountered heavy weather on the 4th inst., and for the safety of lives, vessel, and cargo, I was compelled to cut away to righten the vessel, and to put into this port, as we were in a too disabled condition to go north. A survey will be held on Monday, and I will supplement this letter by a telegram acquainting you what the surveyors recommend to be done in her present leaky and damaged state ; it will likely be necessary to discharge to ascertain damage, and for new masts, &c. This mail closes at once, so I must defer giving you full particulars until next steamer.

"I remain, sir, your obedient servant,

" (Signed)          ABRAM KNOWLTON."

On the 29th of May he sent the following telegram to the owner : —

" ' Julia Blake,' St. Thomas, dismasted, leaky ; consigned Lamb ; sending survey by mail."

Afterwards Lamb & Co., on the 13th of June, and the 22d of June, wrote the owner. Copies of their letters are as follows : —

"French frigate ' Minerve,' *via* Philadelphia.

"ST. THOMAS, 13 June, 1876.

"PETER BLAKE, Esq., Parsboro, Nova Scotia :

"SIR, — We have to confirm Captain Knowlton's letter to you, dated 27th ult., acquainting you that the dismasted brig 'Julia Blake' had put in here in a leaky and disabled condition.

"By surveyors' recommendation the vessel has been discharged, and is to-day on the marine repairing slip, for shipping and caulking, &c.; masts, sails, &c., are being made, and in the course of another month the 'Julia Blake' will probably be ready for sea in a seaworthy state.

"Captain Knowlton dispatched you a telegram, thus : —

" ' " Julia Blake," St. Thomas, dismasted, leaky ; consigned Lamb ; sending survey by mail.'

on the 29th ult., which no doubt reached you promptly and correctly. From his not receiving any reply from you, he concluded that you wished him to follow the customary routine with documents, &c. Meantime we hand, herein, certified copy of extended protest from the 'British consulate,' which may interest you. No doubt your letters will state in what manner accounts here are to be paid.

"We remain, sir, yours faithfully,

"(Signed)    LAMB & Co."

" ' Alpha,' *via* Halifax.

"ST. THOMAS, 22d June, 1876.

"PETER BLAKE, Esq.; Parsboro, Nova Scotia :

"SIR, — We last wrote you on the 13th instant, *via* Philadelphia, with certified copy of extended protest per 'Julia Blake,' which we trust has reached you safely.

"The S. S. 'Alpha' arrived here to-day from Halifax without bringing us any letter from you, but Captain Knowlton tells us that he had a communication, and we therefore refer you to him or his advices for particulars, in connection with the repairing and refitting of the brigantine 'Julia Blake.'

"We suppose that your next will furnish instructions regarding funds for expenses here; if you don't provide the needful, same

will likely be raised by bottomry and respondentia loan, payable on arrival at New York.

"The 'Julia Blake' should be ready for sea about 15th proximo, and

"We remain, sir, your obedient servants,

"(Signed)         LAMB & CO."

To these letters of Lamb & Co., Blake, the owner, replied thus :—

"PARSBORO, July 4th, 1876.

"JAMES DONALD LAMB & CO., Esqrs., St. Thomas:

"DEAR SIRS,—I received your favor yesterday, as likewise of the 13th June, by way of Philadelphia, on the twenty-ninth day of June. My dear sirs, I did not know who to write to until lately, as Mr. J. F. Whitney was writing and getting me to write to G. R. Smith, Saint Thomas. I don't know any person there ; please excuse me, as I could not answer your letter before this time; as for the 'Julia Blake' and the funds for repairing, I think it will be all right. I hope it won't be too much. I think J. F. Whitney will see it all paid after she comes to N. York. Please give all the time you can, and I guarantee you will have the pay, as I pay every one. My dear sir, this is a thing I never had to do before, you, or any person acting for the 'Julia Blake' will be sure of your pay; the vessel is worth all expenses. I depend on you to do what is right and just; after an adjustment and everything, the whole of the repairs won't come out of me. I think I will be able to pay my share, as Captain Knowlton will tell you. I want you to make sure of yourself *by bottomry* until you see how this will go in N. York; you will please let me know by return of steamer from St. Thomas all the particulars, as also the amount of repairs, and by so doing you will much oblige your humble servant,

"(Signed)         PETER BLAKE."

On receipt of this, Lamb & Co. wrote the following letter :—

"Copy pr. S. S. 'Alpha.'

"ST. THOMAS, 20 July, 1876.

"PETER BLAKE, Esq., Parsboro, N. S.

"DEAR SIR,—We have to acknowledge the receipt of your valued favor of 4th instant, the contents of which claim our best attention.

"The 'Julia Blake' is progressing with her repairs, and will soon be ready to take in cargo; we cannot, at present, give you any precise estimate of the expenses, as a good deal remains to be done

yet, but Captain Knowlton is putting the vessel in first-rate order, having at the same time regard to every practicable economy.

"The case being one of 'general average,' the cargo will, of course, contribute its proper proportion towards expenses, and we think the documents which Captain Knowlton will take with him, will render the adjustment speedy and satisfactory to all the interests and parties concerned.

"We are, dear sir, yours faithfully,

"(Signed)        LAMB & Co."

Under date of June 1, 1876, Lamb & Co. wrote the shipper of the cargo at Rio de Janeiro as follows:—

"'Star Ball' steamer from Porto Rico.

"RIO JANEIRO.                    "ST. THOMAS, 1st June, 1876.

"DEAR SIR,—We have to advise that the brigantine 'Julia Blake' put in here on the 27th ult., dismasted and leaky. A survey has been held, and for effecting repairs, &c., the cargo is being discharged.

"Captain Knowlton tells us that he has cabled the 'casualty' to the United States. As the cargo is consigned 'to order,' we have been unable to acquaint the New York consignees of the misfortune.

"We remain, yours faithfully,

"(Signed)        LAMB & Co."

During all the time the vessel was at St. Thomas there was facility for telegraphic communication with New York, and until the 21st of July with Rio de Janeiro, by way of New York, London, Lisbon, and Pernambuco. On this last date a break occurred in the cable between Bahia and Rio de Janeiro, but the Western Union Telegraph Company continued to transmit telegrams to Bahia, from whence they were forwarded to Rio de Janeiro, the time required for transmission from New York to Rio de Janeiro being about five days. These lines of telegraph were often employed by merchants and men of business at St. Thomas, and that from St. Thomas to New York was known to and used by the claimants. From the findings it does not appear that the telegraph was used by any of the parties after the telegram was sent the owner of the vessel on the 29th of May, and no other letters appear to have passed between the parties until after the vessel had completed her repairs and sailed with her cargo for New York.

Immediately after the second survey was completed the repairs on the vessel were commenced. The bills for the repairs and supplies were paid by Lamb & Co., after the master had certified to their correctness. The repairs were completed on the 22d of July, and thereupon the master advertised for a loan on bottomry and respondentia of ship, freight, and cargo, to the amount of $7,500, or thereabouts. The Bank of St. Thomas alone made a proposal, and for the whole amount, at a maritime interest of fourteen per cent. Lamb & Co. made no inquiries as to the necessity of the repairs and supplies, but relied wholly on the statement of the master. The only inquiry made by the bank was as to the sufficiency of the security and the regularity of the papers in their form of execution.

The discharge of the cargo was necessary in order to stop the leaks and make the vessel seaworthy. The repairs and supplies furnished, as well as the remetalling, were necessary to put the vessel in a seaworthy condition for a voyage to New York.

When the loan came to be closed, the master told Lamb & Co. that a large amount of expenses had been incurred of which they had no previous information, and that the amount required to defray the expenses and pay their commissions and charges was $11,600. This amount the bank advanced, and took the bond. The vessel left St. Thomas on the 5th of August. On her arrival in New York the payment of the bond was refused, and she, with her freight and cargo, was libelled.

The cargo was not perishable and would not have been injured by being stored under cover at St. Thomas for three or four months, and was worth in New York about $18,000. St. Thomas is a central port where vessels go seeking business, and to which parties requiring vessels also go. Vessels for the shipment of merchandise are always available there. The cargo could have been forwarded from there by vessels other than the "Julia Blake" for from $1,000 to $1,500, and it was for the interest of the owners that it should be so forwarded, rather than hypothecated to pay ·for repairs to the "Julia Blake."

On the 28th of September, after the vessel had sailed for

New York, Lamb & Co. wrote the shipper of the cargo as follows : —

"Per S. S. 'Nile,' *via* Southampton.

"RIO DE JANEIRO. "ST. THOMAS, 28th September, 1876.

"DEAR SIR,—Your favor of the 13th July last reached us recently *via* Porto Rico, and only after the 'Julia Blake' had sailed from this port. The letter of instructions which you mention having given to Captain Knowlton on sailing from Rio has never been laid before us, nor did he produce the charter-party, although we repeatedly asked for it; he alleged that it had been mislaid or lost at the time of the disaster at sea, and, on being questioned, denied having any instructions from you as to the consignment of vessel in case of average. The bills of lading being 'to order' left us no clue as to the consignees of cargo. The casualty was, however, at once cabled to the New York Board of Underwriters.

"While we regret that you should have felt any doubt as to our compliance with your wishes, it will now be clear to you how blameless we are in the matter.

"Whether Captain Knowlton purposely withheld information from us, or if he actually did lose the documents referred to, remains at present open for conjecture only, but the control intended to have been placed with us remained, in part at least, in hands of the captain, as master of the vessel.

"We would suggest that you advise us by mail of the despatch of all vessels conveying instructions from you to our firm, in the event of their putting into this port in distress — would thus, if necessary, be able at once to take up a position with the master, and the protection of your interests at our hands can thus not be disputed or ignored.

"The adoption of such a course on your part is, we think, more advisable under present circumstantial means of mail communication between Rio and St. Thomas.

"We are, dear sir, yours, very truly,

"LAMB & Co."

The letter from the shipper referred to is not included in the findings, and it nowhere appears that it was in evidence.

The case depends entirely on the authority of the master of the vessel to give the bottomry bond on the cargo. It is now the settled law of the English courts that a master "cannot bottomry a ship without communication with his owner, if

communication be practicable, and, *a fortiori*, cannot hypothecate the cargo without communicating with the owner of it, if communication with such owner be practicable." *The Cassa Marittima*, 2 App. Cas. 156.    This doctrine was first announced in *The Bonaparte*, 8 Moore P. C. 459, decided in 1853, and has been steadily adhered to since, not, however, without decided opposition by Dr. Lushington. *The Hamburg*, 2 Moore P. C. N. S. 289; *Cargo ex Sultan*, 1 Swabey, 504.    Whether the rule, to the extent it has been carried in England, is in accordance with the general maritime law, as understood in this country and the maritime nations of Europe other than Great Britain, or whether, since the "Julia Blake" was a British vessel, the authority of her master in a Danish port is to be determined by the English law, instead of the general maritime law, or the law of Denmark, are questions we deem it unnecessary to consider; for, in our opinion, even under the most liberal construction of any recognized rule which can be invoked for the authority of the master over the cargo, this bond cannot be sustained.

The master can neither sell nor hypothecate the cargo, except in case of urgent necessity, and his authority for that purpose is no more than may reasonably be implied from the circumstances in which he is placed.    He acts for the owner of the cargo because there is a necessity for some one to do so, and, like every agent whose authority arises by implication of law, he can only do what the owner, if present, ought to do. Necessity develops his authority and limits his powers.    What he does must be directly or indirectly for the benefit of the cargo, considering the situation in which it has been placed by the accidents of the voyage.    As was said by Sir William Scott in *The Gratitudine*, 3 C. Rob. 240, 261, by which the power of the master, under proper circumstances, to hypothecate the cargo to pay the expenses of repairs on the ship was incontrovertibly established : " In all cases it is the prospect of the benefit to the proprietor that is at the foundation of the authority of the master.    It is therefore true that, if the repairs of the ship produce no benefit or prospect of benefit to the cargo, the master cannot bind the cargo for such repairs ; but it appears to me that the fallacy of the argument, that the

master cannot bind the cargo for the repairs of the ship, lies in supposing that whatever is done for the repairs of the ship is, in no degree and under no circumstances done for the benefit, or with the prospect of benefit, to the cargo; whereas the fact is, that, though the prospect of benefit may be more direct and more immediate to the ship, it may still be for the preservation and conveyance of the cargo, and is justly to be considered as done for the common benefit of both ship and cargo." To the same effect is what was said by Chief Baron Pollock in *Duncan* v. *Benson*, 1 Exch. 557 : "But this agency for the freighter is confined to cases affecting his interest, and where the sale or pledge is directly or indirectly for his benefit. It is directly beneficial where goods are damaged by perils of the sea, and sold; it is indirectly so where there is damage to the ship, and the repairs become necessary for the benefit of the whole adventure." Sir Robert Phillimore was even more explicit in the case of *The Onward*, Law Rep. 4 Ad. & Ec. 38, 57, where he used this language : "The next consequence from the doctrine of agency is that the master must sustain, to the best of his power, the interest of the absent owner. This is a principle of general maritime law, and not . . . of English law only. Boulay-Paty observes, . . . he must do that which there is fair reason to suppose the owner, if present, would do. . . . The master is to remember the foundation of his authority to give a bottomry bond on cargo is the prospect of benefit, direct or indirect, to the proprietor of it. This principle limits the authority of the master in this matter." So, in this country, Mr. Justice Washington said, in *Ross* v. *The Ship Active*, 2 Wash. C. C. 228, 237 : "But at all events the necessity must be such as to connect the act with the success of the voyage, and not for the exclusive interest of the ship-owner." Undoubtedly in all such cases much is left to the master's discretion; but, to use the language of Mr. Justice Story in *The Packet*, 3 Mason, 255, 259, "he must exercise it conscientiously for the general interest." This court said, in *New England Ins. Co.* v. *The Sarah Ann*, 13 Pet. 387, 400, speaking of the analogous authority of the master to sell the ship : "All will agree that the master must act in good faith, exercise his best discretion for the benefit of all concerned, and that it can only

be done upon the compulsion of necessity, to be determined in each case by the actual and impending peril to which the vessel is exposed." And in *The Amelie*, 6 Wall. 18, 27, it was said : " And this necessity is a question of fact, to be determined in each case by the circumstances in which the master is placed and the perils to which the property is exposed. If the master can within a reasonable time consult the owners, he is required to do it, because they should have an opportunity to decide whether, in their judgment, a sale is necessary." When the master is dealing with the cargo for the benefit of the voyage, he " must endeavor to hold the balance evenly between his two principals ; he must not sacrifice the ship to the cargo or the cargo to the ship." *The Onward, supra.*

It is equally well settled that a lender, upon the hypothecation of the cargo by a master of the vessel under his implied authority, is chargeable with notice of the facts on which the master appears to rely as a justification for what he is doing. Such a lender is presumed to know that the power of the master is to be determined by the necessities of the case in their legal operation on the owner of the cargo. As necessity creates the agency, and that only can be authorized which, under the circumstances, is reasonable and just, he must make his own inquiries and judge for himself, and at his own risk, whether, if the owner were present, he would do or ought to do that, or something equivalent, which the master is undertaking to do for him in his absence. A lender cannot shut his eyes to existing facts as they appear, or by reasonable inquiry could be made to appear, and treat with the master as a general agent, having authority to do not only what the owner ought to do, but what he might do if he chose. Before there can be a recovery against the owner it must be shown that the circumstances were such as to make it apparently proper for the master to do what he has done. To this extent the burden of proof is clearly on the lender. *The Aurora*, 1 Wheat. 96 ; *Thomas* v. *Osborn*, 19 How. 22; *The Amelie*, 6 Wall. 18 ; *The Grapeshot*, 9 id. 129; *The Lulu*, 10 id. 192. In these cases the rule was applied to the hypothecation of the ship by the master, where less strictness will ordinarily be required than in the hypothecation of the cargo, because the master is the

appointed agent of the owner of the ship, but the involuntary agent of the owner of the cargo.

It remains only to apply these well-settled rules to the facts of the present case.

When the loan was advertised for and put on the market the cargo was out of the vessel and in store. It was not perishable, and could be sent forward to its place of destination in another vessel, without any considerable delay, at a cost of from $1,000 to $1,500. The vessel had been two months in port. Her cargo was consigned to New York. The bills of lading were drawn to the order of the shipper, but accompanying them was a letter to the master instructing him to whom to report at the end of his voyage. If this letter had been lost, as the master claimed it was, the fact that it had been given was not forgotten by him, for when he first went to Lamb & Co. he told them of its loss. From that time for nearly two months, and until the day before the loan was advertised for, telegraphic communication between St. Thomas and Rio de Janeiro was practicable and reasonably direct. The necessity for unloading the cargo and making extensive and costly repairs on the vessel to fit her for the further prosecution of the voyage was known as soon as the surveys were completed, and yet neither the master nor Lamb & Co. made any attempt to ascertain from the shipper by telegraph his wishes about the disposition to be made of the cargo under the circumstances, or even to get information as to the names of the consignees in New York, with whom there could be communication both by mail and telegraph. Lamb & Co. did, indeed, on the 1st of June, write the shipper by mail that the vessel had put into St. Thomas dismasted and leaky; that a survey had been held, and that, for effecting repairs, the cargo was being discharged. But even this meagre information did not probably reach its destination until about the 13th of July, — only a few days before the loan was advertised for.

Although Lamb & Co. were engaged by the master to attend to the business of the vessel and her repairs, they made no inquiry as to the propriety of what was done, but relied entirely on his statements, and apparently allowed him to do what he pleased; for it was not until a loan of $7,500 had been applied

for and taken, that they knew it would require $11,600 " to defray expenses and their charges and commissions," and then only when it was told them by him.

The findings show that when the vessel had been out from Rio de Janeiro a little more than thirty days " her rigging parted and her masts fell, the mainmast breaking at the saddle and her foremast at the head." On her arrival at St. Thomas her cargo had to be discharged to stop the leaks; her metal was " much broken and torn away and ragged," and had to be replaced with new to make her seaworthy for a voyage to New York; and although on her reaching there she was attached and sold for but $4,500, leaving, after paying wages of the crew and expenses of the sale, only $3,500 to apply on the loan, the aggregate of her expenditures in St. Thomas was $11,600.

From these facts it is, to our minds, apparent that when the vessel arrived at St. Thomas she ought not to have been repaired at the risk of expense to the owner of the cargo without his consent, and that this could easily have been ascertained by an inquiry into the facts. She came in " dismasted and leaky " " for a general equipment and refit," with a cargo substantially imperishable, which might be forwarded in another vessel at comparatively small expense; and it must have been easy to see that to repair the vessel at the risk of the owner of the cargo would be to place his interests in jeopardy, without any urgent necessity on his account. No master who " held the balance evenly between his two principals " could have believed himself justified, under the circumstances, in hypothecating the cargo for any such purpose, without notice to the owner. But when the repairs were completed, and the hypothecation was tendered, the impropriety of what the master proposed to do was even more apparent. Then the offer was to pledge vessel, freight, and cargo for $13,324, when the most casual observer must have seen that the vessel and freight would actually secure only a comparatively small part of the amount required. Of all this the lender, who made no inquiries whatever, is chargeable in law with notice. Had he inquired, and been deceived through no fault of his own, the case might have been different; but having failed to inquire at all, he is pre-

sumed to know all that the master knew.  His case presents itself, therefore, as that of a lender upon the hypothecation of a cargo by the master, without communication with the consignee or owner, to pay the expenses of permanent repairs to the vessel, when it was manifest that the owner of the cargo could not be benefited by what was done to anything like the amount with which he was to be charged.

. It is contended, however, that the owner of the cargo has no right to demand his property at an intermediate port unless the voyage has been actually abandoned or the necessary repairs on the vessel cannot be effected.   The cargo owner is not bound to help the vessel through with her voyage under all circumstances.   It is the duty of the vessel owner, and of the master as his appointed agent, to do all that in good faith ought to be done to carry the cargo to its place of destination, and for that purpose the cargo owner should contribute to the expense as far as his interests may apparently require ; but he is under no obligation to sacrifice his cargo, or to allow it to be sacrificed, for the benefit of the vessel alone.   He ought to do what good faith towards the vessel demands, but need not do more.   If he would lose no more by helping the vessel in her distress than he would by taking his property and disposing of it in some other way, he should, if the vessel owner or the master requires it, furnish the help or allow the cargo to be used for that purpose.   To that extent he is bound to the vessel in her distress, but no further.   When, therefore, a cargo owner finds a vessel, with his cargo on board, at a port of refuge needing repairs which cannot be effected without a cost to him of more than he would lose by taking his property at that place and paying the vessel all her lawful charges against him, we do not doubt that he may pay the charges and reclaim the property. Otherwise he would be compelled to submit to a sacrifice of his own interests for the benefit of others, and that the law does not require.   What charges must be paid will depend on the circumstances of the case.   Sometimes they may include full freight, expenses at the port of refuge, general average charges, and possibly more, and sometimes less; but upon full payment of such as are in law demandable, the cargo must be surrendered.

In the present case, it is not only found as a fact that it was for the interest of the shipper that his property should be forwarded by some other vessel rather than that it should be hypothecated to pay for the repairs, but everything else in the findings points unmistakably to the conclusion that such repairs could not have been effected without an expense to him of very much more than it would cost to reclaim his property, pay all lawful charges upon it, and send it forward by some other conveyance. Under such circumstances, we have no hesitation in saying that the master had no authority to pledge the cargo as he did without the consent of the shipper or consignees. The notice given the shipper was entirely insufficient and furnished no such information as would require him to act otherwise than he appears to have done. He did not get the letter until nearly six weeks after it was written, and from its contents he was justified in supposing that before his property was incumbered to any considerable amount he would be notified by telegraph. Certainly, so long as the mail only was used to communicate with him, he need not have supposed it was necessary at the end of six weeks to employ the telegraph for a response to such information as he got. It must have been apparent from the outset, at St. Thomas, that it would be necessary to hypothecate the cargo to pay for the repairs, if they were made, and there was no excuse for not communicating that fact either to the shipper or the consignees before it was too late for them to object or provide against it. All this the lender of the money could have known if inquiry had been made; and there was abundance of evidence in all directions to show that no prudent cargo owner would voluntarily do what the master was doing for him. Clearly, therefore, the hypothecation of the cargo was unauthorized and void.

It is insisted, however, that if the bottomry bond cannot be enforced, the cargo may be held in this suit for such charges as it was liable for to the vessel. No such claim is made in the libel. Full freight has been paid, and there is nothing in the case as it comes to us to show that anything more was demandable. If the vessel was unseaworthy when she left Rio de Janeiro, all the extraordinary expenses she incurred on the voyage were probably through her own fault, and not charge-

able on the cargo.    At any rate, there is nothing in the record as it now stands to make it proper for us to remand the cause for further proceedings under this new claim.

*Decree affirmed.*