## THE SCOTIA.

## MILLS v. THE SCOTIA.

## TWEEDY et al. v. SAME.

(*District Court, S. D. New York.* August 8, 1888.)

1. **MARITIME LIENS—SUPPLIES—BRITISH VESSEL—LAW OF THE FLAG.**
   The tacit lien for supplies furnished to foreign vessels is created, where it exists at all, by the maritime law, not by the master's will. It depends wholly on the law of the place, not of the vessel's flag. The general maritime law gives such liens to material-men for necessaries furnished to a foreign vessel on the order of the master.

2. **SAME—ENGLISH LAW—MASTER'S AUTHORITY—LEX LOCI CONTRACTUS.**
   Though the English law gives no such lien, this does not affect the application of the general maritime law to British vessels in other countries, nor abridge the authority of British masters to obtain necessary supplies by simple contract in foreign ports where the law creates a lien, nor prevent such lien from attaching. Many English cases recognize the validity of such foreign liens. *Sembl·*, by the continental maritime law compliance with the *lex loci contractus* is sufficient.

3. **SAME—PRIOR MORTGAGES.**
   Supply-men in New York and Hayti, who there furnish necessaries to a British ship on the master's order and on the credit of the ship, have maritime liens therefor which take precedence of prior mortgages.

In Admiralty. Libel for supplies.

In the first above libel the sum of $581.63 was claimed for necessary supplies furnished in December, 1886, at the port of New York, to the steam-ship Scotia, of Glasgow, Scotland. In the second case the claim is for similar advances made on account of the vessel at Hayti. Upon the arrest of the vessel in these suits, the mortgagees, under a mortgage made prior to the date of the supplies,· intervened as claimants, and resisted the alleged liens on the ground that the master had no authority to create them; that the limits of his authority in the business of the ship are determined by the law of the flag, that is, in this case, by the law of Great Britain, and that by that law the master had no power to create liens on the ship, except by bottomry; and that consequently in these cases no maritime liens existed. It was admitted that, except for that objection, and according to our own law, and the law of Hayti, which is similar to that of France, a maritime lien would have arisen in each case.

*Wing, Shoudy & Putnam*, for libelant Mills.

*E. E. Fitzgerald*, for libelants Tweedy *et al.*

*George A. Black*, for claimants.

BROWN, J. The result of the long controversy in England between the courts of common law and the courts of admiralty was to curtail the latter of their jurisdiction to a large degree. Since then the maritime liens recognized in England have been comparatively few; and

some of these rest only upon recent statutes, the construction of which has been variable and doubtful. No lien is recognized for breach of contracts of carriage under charter-parties or bills of lading, nor for damages to goods carried on board ship, nor for goods undelivered, lost, or destroyed. *Morewood* v. *Enequist*, 23 How. 494; *The Prince George*, 4 Moore, P. C. 21; *The Victoria*, 12 Prob. Div. 105, (1887.) The chief maritime liens recognized are for wages, salvage, bottomry, and collision. It was at one time supposed that maritime liens for supplies furnished to British ships in British ports out of England were still upheld, (*Hussey* v. *Christie*, 13 Ves. 594; *Ex parte Halkett*, 3 Ves. & B. 135; 3 Kent, Comm. *169;) and this view probably had some influence in moulding our own law so as to admit liens for supplies furnished in other states, though refused for supplies furnished in the ship's home port, (*The Eagle*, Bee, 78; *The New Jersey*, 1 Pet. Adm. 227, note; *The Jerusalem*, 2 Gall. 349.) But it is now declared, and seems well settled in the English law, that material-men have not, and "never rightfully did have," any maritime lien for supplies furnished within English territory, either to British or to foreign ships. "The case of *The Neptune*," (3 Knapp. 94,) says Dr. LUSHINGTON, (*The Herzogin Marie*, 1 Lush. 294,) "swept away the last vestige of such a lien." Although the statutes of Victoria have now restored to the English courts of admiralty most of their ancient jurisdiction, those statutes, as now construed, have not, as has been sometimes supposed and stated in the comments of our courts on the English law, reinstated maritime *liens* to a corresponding degree, but only to a very limited extent. In favor of material-men, there is no true maritime lien at all, that is, a right that exists from the date of the supplies; but only a statutory lien, carefully distinguished from the former, enforced *in rem*, indeed, in the admiralty courts, but operative only from the time of the arrest of the vessel; in other words, a statutory right merely to arrest the vessel, and to proceed against her to enforce a personal debt of the owners that was not previously any lien upon the vessel at all. *The Neptune*, 3 Knapp, 94; *The Pacific*, Brown & L. 243; *The Henrich Bjorn*, 11 App. Cas. 270; *The Rio Tinto*, 9 App. Cas. 356; *The Pieve Superiore*, L. R. 5 P. C. 482. Yet by the decisions in the cases of *The Mary Ann*, L. R. 1 Adm. & Ecc. 8, *The Fairport*, 8 Prob. Div. 48, and *The Sara*, 12 Prob. Div. 158, it is held that, under the phraseology of the admiralty court act of 1861, the *master* has a true maritime lien, not only for his wages, but also for the cost of necessary supplies that he has procured for the ship, and for which he has made himself liable, even though he has not yet paid for them, and though a lien for the same supplies is denied to the creditor who furnished them. Such is at this moment the peculiar and anomalous condition of the English law as respects maritime liens.

The defendant's contention is based upon some language found in the opinion of Mr. Justice STORY in *Pope* v. *Nickerson*, 3 Story, 465, quoted in the case of *The Woodland*, 7 Ben. 110, 14 Blatchf. 499, to the effect that a master's authority is limited by the law of the ship's home, and upon the

English decisions that a master can create a lien for supplies by bottomry only. *Stainbank* v. *Fenning*, 11 C. B. 51. The same point was made in the precisely analogous case of *The Melita*, 3 Hughes, 494, 498, and, on consideration, overruled. If this contention were sound, then, under the plea that an English master had no authority to contract a lien except in accordance with English law, the English law of liens, as respects British ships, would supersede the law of all other countries, even as to contracts for supplies, and as to other transactions made and to be performed within the exclusive jurisdiction of the latter. Not only liens for supplies, but liens for freight, for damages to cargo, for non-delivery, or short delivery, and for bad stowage, or other negligence in the performance of the ship's duties, would all be annulled, as respects British ships, in the tribunals of every other country. The general maritime rule that the ship is bound to the goods, and the goods to the ship, would be *pro tanto* abrogated. I do not find that the tribunals of any country in which the general maritime law prevails have ever extended any such exemption to British ships, or to the ships of any other country whose law was exceptional and peculiar, except in cases where the litigation had respect to persons or transactions wholly belonging to the latter, in which case the foreign law was justly applicable on principles of comity. In our own country, since the decision in *Pope* v. *Nickerson*, not only many decisions upholding liens for supplies to British ships, but the common practice in innumerable other cases sustaining liens for loss, damages, or injury to cargo, shows that the principle contended for by the defendant has no place in our jurisprudence. *The Walkyrien*, 3 Ben. 394, 11 Blatchf. 241; *The Eliza Jane*, 1 Spr. 152: *The Selah*, 4 Sawy. 40; *The Melita*, 3 Hughes, 494.

1. The lien or privilege in all these cases is not properly created by the master at all; nor does it rest merely upon his authority. It is created by the law of the place of the transaction. Where the law gives the lien, the master's authority is, therefore, not in question, save as respects his right to do those acts, or to make those contracts, to which the law of the place attaches the lien. In the case of *The Young Mechanic*, 2 Curt. 404, 410, Mr. Justice CURTIS says the lien "is an appropriation made by the law of a particular thing as security for a debt or claim; the law creating an incumbrance thereon. * * * It is a real and vested interest in the thing, constituting an incumbrance placed thereon by operation of law, [page 413.] * * * They subsist and bind the property * * * by operation of the law which creates them, and fixes them on the property at the moment when the debts are incurred." Citations to the same effect might be added almost indefinitely. See, per STORY, in *The Nestor*, 1 Sum. 84; *The General Smith*, 4 Wheat. 438, 444; per BETTS, J., in *The William and Emmeline*, Blatchf. & H. 66, 70; per WARE, J., in *Davis* v. *Child*, 2 Ware, 81. The language of the maritime codes is similar, of which that of France is a type, specifying "those debts that the *law* declares privileged." Code Com. §§ 190, 191. So the Roman law, *"privilegium habet."* Abb. Shipp. †142,

note. These implied liens, therefore, if they exist at all, exist by virtue. of the law applicable to the transaction, whether of contract or of tort. The law creates such liens in the interests of commerce, whether for the. benefit of the ship, or of the freighter or creditor, or of the party injured by the ship's negligence or wrong. That law must therefore be enforced within the limits of its jurisdiction.

2. The master, by the English law, as well as by the law of every other country, has authority in foreign ports to contract generally, and by simple contract, for necessary supplies. Nowhere has necessity, as the foundation of the master's general authority, been more forcibly stated than in the judgments of Lord STOWELL. In the case of *The Gratitudine*, 3 C. Rob. 240, 266, speaking of the master's authority, he says: "Necessity creates the law. It supersedes the rules; and whatever is reasonable and just in such cases is likewise legal." See *The Julia Blake*, 107 U. S. 418, 428, 2 Sup. Ct. Rep. 692. As the master's authority to procure supplies by simple contract, in the necessities of navigation, is undoubted, a lien upon the ship therefor, created and given by the law of the place of the transaction for the security of the material-man, must take effect according to the *lex loci* in a suit brought there to enforce payment, unless the parties actually or presumably contracted with reference to some different law, or unless the ship is entitled to exemption from the *lex loci* upon some principle of international law or comity. Though public vessels are thus exempt, there is no principle and no presumable intention upon which private ships can claim similar exemptions upon simple contracts for supplies that are made and are designed, as in this case, to be completely performed within the country and the jurisdiction where the supplies are furnished. Foreign ships, like foreign citizens while dealing in another country with its citizens, owe it a temporary allegiance; and, as respects such contracts, they are subject to the law of that jurisdiction, and to all the securities and remedies that the *lex loci* gives. Story, Confl. Law, §§ 322-328, 401-423, *b, d,* 575; Whart. Confl. Law, §§ 317, 324-358, 444, 473; 2 Dufour, Droit Mar. § 818; 1 Desjardins, Droit Mar. § 104; 1 Valroger, Com. du Code, §§ 38, 90, 436, 442. They are subject to a maritime lien, for the debt, when the local law creates such a lien, precisely as they are subject to attachment on mesne process in a common-law action against the owners for the same debt, when the local law gives the right of attachment. It is the same as regards liens imposed by the local law for compulsory pilotage, for harbor dues, for the non-observance of quarantine regulations, or other penalties for the master's delinquencies.

In contracts to be performed elsewhere, such as contracts of affreightment, and of bottomry, other considerations arise as to the law applicable to the transaction; depending upon the reasonable or presumed intention of the parties, the conveniences of commerce, and the justice of the case. See *The Brantford City*, 29 Fed. Rep. 373, 383-396, and cases there cited. Whether a lien created by the local law shall be recognized and enforced in another country upon the *res* when found and seized

there, depends upon the law of comity. If the law of the latter country does not recognize any similar liens, as between its own citizens, it will not ordinarily enforce the foreign lien in favor of a foreigner to the prejudice of its own citizens. Liens and privileges, when enforced in other countries than in those by whose laws they are created, are largely treated as remedies; and, unless affecting foreigners alone, take rank according to the law of the forum. Story, Confl. Law, §§ 323, 423, *b*, *d;* 1 Desjardins, Droit Mar. § 104; Whart. Confl. Law, §§ 324, 335–348.

3. The cases of *Stainbank* v. *Fenning*, 11 C. B. 51, and *Same* v. *Shepard*, 13 C. B. 418, have no application to the present case; for no question in either arose on the local law, because the supplies in those cases were furnished to British vessels in British ports; and in each case the only question was whether the master, in a port where the law created no lien, could himself create one; and it was held that he had no authority to do so, except in the form of regular bottomry. Mr. Justice CURTIS points out in *Thomas* v *Osborn*, 19 How. 22, 28, that these English decisions had no reference to the effect of a local law creating the lien. Here, on the contrary, the only question is whether our maritime law fails to take effect in creating a lien for supplies furnished here on the ship's credit, simply because the vessel happens to be British, and because the British courts hold that the master cannot create such liens except by bottomry. If so, the laws of every country, as respects liens and privileges on foreign ships, would depend, for their force, even within their own dominions, upon the assent of other nations,—a principle at war with the independence and equality of sovereign states. So, in case of *The Woodland, supra,* which is much relied on by the defendants, the action was based wholly upon an alleged express lien created by a British master, by a draft given at St. Thomas, for repairs, and expressed to be "recoverable against the vessel, freight, and cargo." I have carefully examined the record in that case. Neither the libel, the answer, nor the record of the trial shows any claim of lien under the law of St. Thomas. The action was brought by an indorsee of the draft, who relied solely upon its terms, and on his rights as a *bona fide* indorsee of the draft, notwithstanding the fraud and collusion between the original parties. The case has, therefore, no application to the present. On argument of the appeal in the supreme court (104 U. S. 180) it would seem that an attempt was made to sustain the lien under the law of St. Thomas. The court, in its opinion, after stating that the draft did not create any express lien, deals with the facts at considerable length, in order to show that the vessel in truth owed the supply-men nothing, and hence could not be subject to an implied lien under the general maritime law; a needless task, if the defendant's contention in this case is sound. The opinion implies and presupposes that a lien by the *lex loci* would have existed had anything remained unpaid that was really owed by the ship for the supplies. In the subsequent case of *The Julia Blake*, 107 U. S. 418, 426, 2 Sup. Ct. Rep. 692, also, the supreme court was not prepared to adopt the theory there, as here, contended for, that the master's authority in a

foreign port was to be determined by the law of his own country, "rather than by the general maritime law, or the law of the place of the transaction;" and the inference from the language of Mr. Justice GRAY, in *Watts* v. *Camors*, 115 U. S. 353, 362, 6 Sup. Ct. Rep. 91, is that the general maritime law should determine such questions, rather than the exceptional and peculiar law of a single country.

The suggestion of STORY, J., in *Pope* v. *Nickerson*, 3 Story, 480, 483, that the master's authority is "limited to the express instructions of the owner or the law of the country where the ship belongs," is much narrower than his previous exposition of it in the same case, (page 477,) namely, as "limited by the express or implied authority derivable from the laws of the country, or the usage of the trade, or the business of the ship, or the instructions of the owner." The authority to be implied from the usages of the trade and the business of the ship would seem reasonably to include all those rights and acts customarily exercised and performed by ship-masters in the ports to which they are sent by the owner to deal, or to which they may be forced to repair in the contingencies of the voyage, that is, such as are authorized by the general maritime law, irrespective of any peculiar or exceptional restrictions belonging to his own country, which foreigners are not presumed to know, and are not required to ascertain. *Searight* v. *Calbraith*, 4 Dall. 327. Under the general maritime law there is never any such alternative as has been sometimes supposed, viz., either freedom from foreign liens, or an unlimited authority in the master, whereby owners might be ruined by his contracts abroad; for the same maritime law equally protects the owner by its limitation of his responsibility to the needs of the vessel, and to the value of the ship and freight. *Naylor* v. *Baltzell*, Taney, 58.

In no case that I have found has there been any final adjudication in opposition to the general maritime law, resting upon the narrow limitation of the master's authority here contended for. In the case of *Lloyd* v. *Guibert*, L. R. 1 Q. B. 115, it is a significant fact, not only that the decision itself was in accordance with the general maritime law, but that in the decision of the appeal in the exchequer chamber no countenance was given to the alleged controlling force of the mere law of the ship's flag, on which the decision below had proceeded; and the affirmance was upon wholly independent considerations. Pages 120, 129, 130. Subsequent authorities, both English and continental, do not support this narrow contention. See citations in *The Brantford City*, 29 Fed. Rep. 373, and Whart. Confl. Laws, §§ 335, 348, 441. In foreign jurisprudence, notwithstanding the general provisions of the maritime codes requiring certain formalities to the creation of simple liens, or of bottomry, the decisions of the courts, on the whole, sustain such liens in favor of *bona fide* lenders in foreign countries, notwithstanding the fact that the formalities prescribed by the law of the ship's home are not complied with. 1 Desjardins, Droit Mar. Com. §§ 181, 508; Dufour, Droit Mar. Com. § 294; 1 Valroger, Droit Mar. Com. §§ 38, 436, 442; *De Gentil* v. *Chambon*, (Court of Cassation, Dec. 4, 1866,) Dalloz, 1867,

1, 161, and note; *Seager* v. *Sevastano*, (Court of Cassation, Naples, March 1, 1883,) 1 Rassegna, Diritto Com. 199.[1]

Upon considerable research I have found no case in which a bottomry bond, entered into in good faith and in compliance with all the requirements of the law of the place of the transaction, has ever been held void in the courts of the country where it was made, because it did not conform to the law or to the decisions of the country to which the ship belonged. Still less has the doctrine of the restriction of the master's authority abroad to the law of his own country any application to the liens created by the law of other countries upon ordinary maritime transactions within their dominions, when prosecuted in their own tribunals.

4. But the English cases do not sustain the respondent's contention that a British master has no authority to incur a simple maritime lien

[1]The observations of the court in this case are so pertinent to the general question that the following translation, furnished by counsel, is appended:

"SEAGER *v.* SEVASTANO.

"(*Court of Cassation.* Naples. March 1, 1883.)

"HEAD-NOTE. In Italian legislation the rule of private international law is sanctioned, *locus regit actum,*—the place governs the act,—not only for what relates to the form, but also to the substance and the effects of obligations contracted abroad between Italians and foreigners. In application of such rule, a contract of bottomry made abroad with a foreigner by an Italian captain of an Italian vessel remains valid and efficacious for binding the owner of the ship, when the conditions required by the law of the place of contract are fulfilled, even although all the requirements of the Italian law may not have been observed. * * *

"BY THE COURT. * * * It is quite true that, in the general interest, it could not be found proper to oblige foreigners to know the laws of other nations relative to contracts, nor to insist that these contracts (which are based on the rules of universal law common to all nations in regard to juridical relations resulting from the volition of persons possessed of legal capacity, and therefore especially governed by good faith) ought to be subjected to the special laws of each nation to which the contracting parties belonged. One general law ought to govern such contracts, and that law could only be the law of the place where they were entered into; that law being presumably known to the parties contracting. To take from the action of this rule contracts made by the captain of a vessel, and to require that they should be governed by the law of the nation of the owner of the ship, would, besides holding everything subject to the requirements of our own published codes, also at the same time involve a conflict of rules, which cannot be allowed in an orderly system of legislation. * * * To apply them [the provisions of the Code] to the contracts made with foreigners in a foreign country would amount to holding that the conditions and methods prescribed by the national law for the exercise of the powers conferred on the captain, in order that the obligations he assumes may take effect, ought to be known to foreigners; while foreigners are not required to know them in any other kind of contract. * * *

"Looking more closely into the conditions laid down in article 331 of the Commercial Code, it is found to contain certain limits on the authority that the law presumes the captain to have received from the ship-owner, it not being possible to suppose his authority to be so extended as to admit that any obligation whatever that the captain may assume in his official capacity must be binding on his owners, even although the preservation, salvage, or recovery of the ship be not involved. Now, this limitation of authority imposed by the national law for the security of the ship-owner against the bad faith of those to whom the ship is intrusted, does in no degree diminish their full representation of the owner, wherever they may be, by reason of their official character. Foreigners who contract with such representatives, and who, according to the laws of the place, fulfill the conditions necessary to make the obligations assumed by such representatives binding on the principals, cannot be justly held responsible for the non-observance by those representatives of the forms and conditions imposed on them by their own law in the interest of their principals. Such non-observance might be the result of negligence or fraud; and therefore the effects cannot be permitted to the damage of the third party, who has contracted in good faith, supposing that the agent is fulfilling his duty to his principal. The court of appeal could not * * * adjudge, without modification, that the prescriptions of article 331 govern the effect of the obligations assumed abroad by the ship's captain to foreigners for sums loaned for the needs of the ship. On these grounds reversed." MIRABELLI, presiding, and LA VOLPE.

for necessary supplies, or any lien for necessaries otherwise than by bottomry. On the contrary, as above observed, he may raise a lien in his own favor, by simply making himself liable for necessaries procured; and the validity of implied liens in foreign ports under the foreign law, in favor of material-men, has been recognized in numerous English cases in which the decisions have turned wholly upon the validity of such liens in the ports where they were incurred. In no case have I found it even intimated that the *lex loci* creating the lien was invalid or inoperative by reason of any want of authority in the master, or otherwise. It has long been settled in England that a bottomry bond is not valid except for advances made upon the faith of that security; and if prior advances, not made on the credit of the ship, are included in a bottomry bond subsequently given, it will, to that extent, be held invalid. But the validity of bottomry for prior advances has been repeatedly sustained in the English courts in cases where the advances were held to have been made on the ship's credit in consequence of the local law that gave a maritime lien on the ship therefor.

In the case of *The Alexander*, 1 Dod. 278,280, Lord STOWELL said, in reference to advances to an English ship at Pernambuco:

"The question is whether they did not make these advances on the credit of the ship. * * * Some of the advances were made before the master was appointed. 'These,' it is said, 'could have no reference to a bond of hypothecation.' But what could they have looked to but the ship? Of the owners of the ship they had no knowledge. The bond was not, perhaps, noticed at first, because in Pernambuco, as in other foreign states, there is no necessity for an instrument of this kind; for, by the general maritime law, the vessel itself is *ipso facto* liable for repairs. There was no necessity, therefore, for having recourse to a bond until the ship was coming to this country, where, from *peculiar motives of policy*, a special hypothecation is required."

In *The Vibilia*, 1 W. Rob. 1, 13, a bottomry bond was given upon a British vessel at Philadelphia, for necessary repairs made there, which included repairs made before the bottomry bond had been agreed upon. Dr. LUSHINGTON, after quoting the passage from Lord STOWELL, above referred to, adds:

"It is evident, therefore, that, in the opinion of Lord STOWELL, it is competent for the foreign merchant, without any express agreement for a bottomry bond, to make advances on the security of the ship,—that is, upon the faith of a lien given by the law of his own country; and it is not necessary for him to have a bond of bottomry, or an agreement for such bond, until the ship is about to sail."

In the case of *The Prince George*, 4 Moore, P. C. 21, a bottomry bond was executed at New York, by the master, to raise money to pay a demand for which he was personally liable to arrest, and also for damages to the cargo. The bottomry bond was held invalid in the court below, and in affirming this judgment the privy council say:

"The appellant's counsel have contended that, by the law of New York, the consignees of the cargo had a specific lien on the ship for any damage sustained by the cargo. * * * If it had been proved that the law of New York gave the lien upon the ship as suggested, we should have thought * * * that the power to hypothecate would extend to a case where the

ship might have been arrested and sold for a demand for which the owner would be liable."

But as such was not the law of England, it was held that such a law in New York would not be presumed in the absence of evidence. Pages 25, 26. In the case of *The Karnak*, L. R. 2 Adm. & Ecc. 289, L. R. 2 P. C. 505, advances were made at Bermuda for repairs upon an English vessel, which were included in a bottomry bond, subsequently agreed upon and given. It was proved that the law of Bermuda gave a lien upon the ship for such advances. Sir ROBERT PHILLIMORE, who reviews the authorities, says:

"I must now draw attention to another fact proved in this case, and having an important bearing upon the law, which must decide it. It is in evidence that, by the law in Bermuda, those who supplied the necessaries had a lien upon this ship, and could have arrested her."

And, in accordance with the prior decisions, he holds this circumstance sufficient to validate the bottomry; and his opinion in this respect was adopted and approved by the privy council. L. R. 2 P. C. 505, 511. This was in full view of the case of *Lloyd* v. *Guibert*, which shows that the latter case had no reference to any question of a lien for supplies under the law of the country where they were furnished, and is not applicable thereto. So, in the case of *The Laurel*, Brown & L. 191, 317, an English ship had put into Batavia in distress, and there underwent repairs, for which the law of Batavia gave a lien upon the ship, and no bottomry was at first agreed on, but was afterwards given. The bottomry for the first advances was upheld by Dr. LUSHINGTON on the ground of the local lien and the credit given to the ship. He says, (page 320:)

"I think that this case cannot be distinguished from that of the Alexander; in both there is the absence of any agreement to advance on personal credit; and of waiver, direct or indirect, of the right by the *lex loci* to make the ship liable for the repairs."

In all of these cases, had "the law of the flag," in the view of the English judges, abridged the ordinary authority of the master to procure supplies by simple contract, so as to prevent any lien attaching to the vessel under the *lex loci*, there would not have been any authorized credit of the ship, nor any local lien upon the vessel at the place of bottomry; and hence the bottomry could not have been sustained. It was upheld in all these cases, because a credit of the ship was deemed authorized, and because a valid lien was deemed to have been created under the law of the place of the transaction. The same question arose in another form in the case of *Castrique* v. *Imrie*, 8 C. B. (N. S.) 1, 405; L. R. 4 H. L. 414. There an English ship from Liverpool had been furnished with necessary supplies at Melbourne, for which the master drew a draft, which was subsequently indorsed to a French holder. The ship afterwards touched at Havre. The master and ship, upon the non-payment of the draft, were sued for the supplies, and a judgment was obtained, under which the vessel was sold. The vessel afterwards came to England, where a suit for possession was brought by a former mortgagee. All the orig-

inal transactions were between British subjects, in a British port, in reference to supplies for a British vessel, for which there was no lien given by the English law. But though it was held that the French court had erred as to the fact of any lien existing upon the ship, still the title of the purchaser under the judgment was held good. Lord CHELMSFORD, in the decision delivered in the privy council, (L. R. 4 H. L. 414, 447,) says, as to the application of the English law:

"No proof was offered to the French courts whether, by the law in existence at Melbourne, where the bill was drawn by the master of the ship, there was or was not a lien on the ship for necessaries; and they might well assume, in the absence of evidence, that the general maritime law of lien prevailed and attached upon the master's contract."

The implication is that, had "the law in existence at Melbourne" given a lien for supplies, then that law, and not the law of England or Liverpool, would have governed the transaction; and no error would have been committed by the French court.

The defendant's contention cannot, in any point of view, be sustained; and the libelants in each case are entitled to a decree for the amount of the advances and supplies, with interest and costs.