In re ALASKA FISHING & DEVELOPMENT CO.

(District Court, W. D. Washington, W. D.   February 24, 1909.)

No. 627.

1. SALES (§ 208*)—EXECUTORY CONTRACT—TRANSFER OF TITLE.
    An executory contract for the sale and delivery of a quantity of fish to be thereafter caught vested no title in the purchaser until the fish were delivered, although payment was made in advance.
    [Ed. Note.—For other cases, see Sales, Dec. Dig. § 208.*]

2. BANKRUPTCY (§ 347*) — DISTRIBUTION OF ESTATE — PRIORITIES — RECEIVER'S CERTIFICATES.
    The amount of receiver's certificates authorized by a court of bankruptcy to raise money required for the purpose of preserving property of the estate represents an expenditure for the benefit of all parties in interest, and is entitled to priority of payment from the proceeds of such property.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 538; Dec. Dig. § 347.*]

3. BANKRUPTCY (§ 345*)—DISTRIBUTION OF ESTATE—PRIORITIES.
    Priorities between creditors of a bankrupt corporation determined.
    [Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. § 531; Dec. Dig. § 345.*]

4. MARITIME LIENS (§ 7*)—NECESSITY FOR SERVICES—TOWAGE SERVICE.
    A fishing company had salted and put up in barrels a season's catch of salmon at an Alaska port, and placed the same on a barge owned by it. The company, which was a California corporation, was insolvent, and the barge had no motive power. The owner of a tug learning such facts dispatched her to the assistance of the barge; her services were accepted by the master, and she towed the barge to Tacoma. There was no express contract between the tug owner and the company or master of the barge. *Held*, that the tug owner was entitled to a maritime lien for the value of the service on both barge and cargo, the barge alone not being of sufficient value, there being an implied agreement therefor arising from the necessity of the services and the circumstances under which they were rendered.
    [Ed. Note.—For other cases, see Maritime Liens, Cent. Dig. § 11; Dec. Dig. § 7.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

In Bankruptcy. Heard on exceptions to report of a special master respecting priorities between preferred creditors.

Chas. Bedford, for bankrupt and for William Johnson and Roger R. Vair, creditors.

Hughes, McMicken, Dovell & Ramsey and Edward C. Hanford, for Puget Sound Tugboat Company, a creditor.

L. B. da Ponte, for National Bank of Commerce, a creditor.

F. H. Kelley, for trustee.

HANFORD, District Judge. In the fishing season of 1907, the bankrupt corporation had a fishing station in Alaska, where it was engaged in catching salmon and other kinds of fish, and preserving them by salting and putting them up for market in barrels, and it owned and used in that business the barge Enoch Talbot, a vessel without masts or sails or other power of propulsion. At the close of the season the barge, with the season's catch on board, was towed from the fishing station to Tacoma by the steam tug Pioneer, a vessel owned and operated by the Puget Sound Tugboat Company. The corporation appears to have had little, if any, working capital, and it failed to secure a sufficient quantity of fish to equal in value the expenses of the year's operations, and when the barge arrived at Tacoma it had no money to pay for services of the tug, or wages of the barge crew or fishermen or other employés. The wages and some other debts of the corporation and incidental expenses were paid through an arrangement between the managing agents of the corporation, and the captain of the barge, and William Johnson, whereby a broker advanced the money to make said payments, and was reimbursed out of the proceeds of the sale of part of the salt fish, which were taken out of the barge and delivered to Johnson, and then delivered to the purchasers. The bill for towage has not been paid, and the tug's owner claims to have had a maritime lien on the barge and cargo. Before that part of the cargo not sold, as stated, had been unloaded from the barge, a receiver appointed by the superior court of the state of Washington for Pierce county took possession of the barge and employed watchmen. Soon afterwards this proceeding in bankruptcy was initiated by creditors of the corporation, and the same person who was acting as receiver under appointment of the state court was by this court appointed receiver, and thereafter the property was in his custody, as receiver of this court, until it was surrendered by him to the trustee of the bankrupt's estate, chosen in conformity to the bankruptcy law, after the corporation had been adjudicated a bankrupt. During the period of the receivership, a watchman previously employed by Johnson was to some extent looking after the property, and by reason thereof Johnson claims to have had possession of the cargo remaining in the barge as owner thereof. On a showing that there was five feet of water in the hold of the barge, and that it was necessary to discharge the cargo and repack and resalt the fish to prevent deterioration thereof, the receiver obtained from this court authority to borrow money necessary for expenses in the care and preservation of the property, including wages of watchmen,

and he did borrow $1,223 from the National Bank of Commerce, on receiver's certificates, and expended the same in payment of such expenses. Johnson made no application to this court for an order directing the receiver, or the trustee, to surrender possession of the fish, and made no opposition to the doings of the receiver in repacking and resalting the fish, nor to the surrender of the fish to the trustee of the bankrupt's estate, although he had timely information of these proceedings through his watchman and his attorney.

The trustee sold the barge and the fish for a gross sum pursuant to a stipulation signed by attorneys representing all the parties, and the purchase money constitutes the fund to be distributed. By the terms of the stipulation, whatever liens and rights could have been lawfully asserted against the property before it was sold by the trustee are deemed to have become attached to the money which the trustee holds, and, the amount being insufficient to discharge all such claims by paying them in full, it is necessary for the court to determine the priorities.

Johnson appears to have provided the materials for construction of the barrels, in which the fish were packed, and the salt, and to have paid to the bankrupt corporation $5,000 on a contract by which the corporation agreed to fill 2,000 barrels and deliver them to him on a wharf at Tacoma. On these facts and his alleged possession of the fish, Johnson bases a claim as owner of the fish which were sold by the trustee. He also claims a first lien on the fund by right of subrogation, on the alleged ground that the money expended in payment of wages of seamen and others was his money.

The first of these claims is not tenable, because the executory contract for future delivery of fish in barrels at Tacoma was not effective to vest any title to or right of property in fish which had not been caught, and the fact that the fish were still in the hold of the barge when a receiver of this court took possession of them proves conclusively that no sale had been consummated by delivery. Johnson had no lawful authority to seize the barge or place a keeper in charge of it, nor to obstruct judicial process. Nor did the bankrupt corporation or the captain have any right to impair the rights of other creditors, under the bankruptcy law, by surrendering the barge to him. In the proceedings before the special master, reference was made to a bill of sale, but no bill of sale was produced, nor was there any competent evidence to prove the execution or contents of such a document; therefore, no rights can be predicated upon a conveyance of title by a bill of sale.

The disbursements by the receiver were necessary for the preservation of the fish, and the money which he used was loaned on the faith of certificates authorized by the court. In the interest of all parties, the court assumed an obligation to cause redemption of the receiver's certificates out of any fund which should become available, and by reason of such action there is now a sum of money in the hands of the trustee, to be contested for, instead of a quantity of spoiled fish in the hold of the barge. Under these circumstances, any lien which Johnson acquired by right of subrogation is subordinate to the rights of the holder of the receiver's certificates.

The only theory on which Mr. Johnson's claim by right of subrogation can be sustained is that the fish which were sold previous to the appointment of a receiver had become his by delivery to him when unloaded from the barge, and that the proceeds from sales thereof were expended in discharging maritime liens. Those liens, however, if valid, attached to the vessel and cargo, they were equally liens against that part of the cargo sold by the broker as against the remainder, and it would be contrary to equity to allow Mr. Johnson to absorb the entire fund in the hands of the trustee to the exclusion of other maritime liens. Considering that the evidence is indefinite and uncertain as to the amount of valid maritime liens whch have been paid, the court will marshal the assets, including the proceeds of fish sold previous to the receivership. It is the opinion of the court that the money in the hands of the trustee is, in fact, the remnant of a general fund to be disbursed under an equitable rule. In this view, Mr. Johnson's claim is in rank subordinate to the lien for towage, because the other maritime liens have been paid out of the general fund, and this remains unpaid.

Concerning the claim of the Puget Sound Tugboat Company, for towage, the decision of the court allowing the same is rested upon the following facts: An agent of the tugboat company received information by a telephone message from the son of the manager of the bankrupt corporation to the effect that the barge was at Pleasant Bay, Alaska, loaded and in need of the services of a tug to bring her to Tacoma; she was in fact helpless without the assistance of a tug; her owner was a California corporation and insolvent; the agent of the tugboat company believed that compensation for services of the tug would be a valid charge enforceable against the barge and cargo, and, without entering into a contract with any one, the tug was dispatched to Pleasant Bay; her services were tendered to and accepted by the captain of the barge, and the service was performed. The barge is the hull of a worn-out and dismantled sailing vessel of uncertain value, so that there was actual necessity for pledging the cargo as well as the barge for the towage service.

The chief contention in opposition to the lien for towage is that there was no lien, because there was no express agreement between the tugboat company and the owner or master of the barge specifically hypothecating the barge and cargo for the towage bill. The expressions in judicial opinions which seem to support that idea are not in accord with the elementary principle of the maritime law which is the foundation of strictly maritime liens, viz.: Necessity for credit, where the owner has no personal credit engenders a lien for necessaries supplied, at the instance of the master of a ship, to enable the ship to proceed on her voyage in a seaworthy condition; the object of the law being to "furnish wings and legs" to enable a vessel to proceed to her destination. "The vessel must get on; this is the consideration that controls every other; and not only the vessel, but even the cargo, is sub modo subjected to this necessity." The St. Jago de Cuba, 9 Wheat. 414, 6 L. Ed. 122. The lien attaches to the ship and freight, or to the ship, freight, and cargo, as necessity in

each particular case may require.  In cases in which liens have been denied, the Supreme Court has been careful to distinguish those cases by their peculiar facts, and has given a safe rule to be applied in separating valid maritime liens from claims which are not valid, by clearly stating the conditions essential to the validity of a maritime lien.  The General Smith, 4 Wheat. 438, 4 L. Ed. 609, The Rock Island Bridge Case, 6 Wall. 213, 18 L. Ed. 753, and The Julia Blake, 107 U. S. 426, 2 Sup. Ct. 692, 27 L. Ed. 595, are instances.  In the latter case Chief Justice Waite made reference to the decision of Sir William Scott in The Gratitudine, 3 C. Rob. 240, as having incontrovertibly established the power of the master of a vessel, under proper circumstances, to hypothecate the cargo.

The owner being absent and the shipmaster under stress of necessity, a lien for necessaries attaches, by legal implication, without his formal express consent.  "A lien arises if services are rendered and materials furnished for the supply and repair of the ship, in the presence of the master and with his acquiescence, though he does not actually order them."  19 Am. & Eng. Enc. of Law (2d Ed.) p. 1098; The Philadelphia, 75 Fed. 684, 21 C. C. A. 501; Id., 84 Fed. 1020, 28 C. C. A. 684; The Tiger (D. C.) 89 Fed. 384; The Alfred Dunois (D. C.) 76 Fed. 586.

There was no market for the fish at Pleasant Bay, the unpaid wages of the barge crew and of fishermen amounted to a large sum, and, from a business point of view, that was not a pleasant place for the barge and her cargo to remain; she required the assistance of a tug, and it was the duty of her captain, representing all interests, to accept the services of the Pioneer.  That is what he did, and under the circumstances stated, without an express agreement creating a lien, there is a legal presumption that the credit of the vessel and cargo was the inducement for the towage service, and there was an implied hypothecation of both, subject only to the paramount lien for mariner's wages.  The Grapeshot, 9 Wall. 129, 19 L. Ed. 651; The Lulu, 10 Wall. 192, 19 L. Ed. 906; The Patapsco, 13 Wall. 329, 20 L. Ed. 696; The Emily Souder, 17 Wall. 666, 21 L. Ed. 683; Mut. Ins. Co. v. Baring, 20 Wall. 159, 22 L. Ed. 250; The Erastina (D. C.) 50 Fed. 126; The Elm Park, Id.; The Saratoga (D. C.) 100 Fed. 480; 19 Am. & Eng. Enc. of Law (2d Ed.) 1096, 1097.

The court directs that a decree be entered directing that the money in the hands of the trustee be disbursed as follows:

First. To the payment of taxes, if any.

Second. To the payment of all costs and expenses in the handling, preservation, and sale of the property, including redemption of the receiver's certificates and payment of the receiver's compensation in the amount allowed by the referee.

Third. To the payment of the claim of the Puget Sound Tugboat Company.

Fourth. The residue to be paid to William Johnson.